ROBERT B. VANCE & ASSOCIATES, INC. (A Georgia Corporation); The Vance Co. (A Georgia Partnership composed of Robert B. Vance and Selwyn G. Begner); Robert B. Vance and Selwyn G. Begner (Individuals), and Southeast Promotion, Inc., Plaintiffs,

v.

The BARONET CORPORATION (A New Jersey Corporation); and Continental Grain Company (A Delaware Corporation), Defendants.

Civ. A. No. C76–1152A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 21, 1979.

George M. Hopkins, William H. Needle, Newton, Hopkins & Ormsby, Kevin S. King, Trauner, King & Cohen, Atlanta, Ga., for plaintiffs.

Joseph Lefkoff, Nancy Saul, Lefkoff, Pike, Fox & Sims, P. C., Julius R. Lunsford, Jr., Beveridge, Degrandi, Kline & Lunsford, Atlanta, Ga., for defendants.

## ORDER

ORINDA DALE EVANS, District Judge.

This suit seeking injunctive relief and damages for alleged trademark infringement, unfair competition, dilution of Plaintiffs' trademark, deceptive trade practices, breach of contract, and tort is now before the Court for decision following trial without a jury. The Court hereby makes the following findings of fact and conclusions

of law in accordance with Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

### A. IDENTIFICATION OF THE PARTIES

Plaintiff, Robert B. Vance & Associates, Inc. is a Georgia corporation, incorporated in March of 1970. All of the stock of the corporation has been owned from the Plaintiff's inception by Selwyn G. Begner and Robert B. Vance who are, in their individual capacities, also Plaintiffs in this action. The Vance Company is a Georgia partnership formed by Plaintiffs Vance and Begner in March of 1976 upon the dissolution of Southeast Promotion, Inc. that was added as a party Plaintiff by amended complaint in 1978. Plaintiff Robert B. Vance is an individual shareholder and President of Robert B. Vance & Associates, Inc., was a shareholder and Secretary of Southeast Promotion, Inc., and is a partner in the Vance Company. Plaintiff Selwyn G. Begner is an individual shareholder and Vice-President of Robert B. Vance & Associates, was a shareholder and President of Southeast Promotion; Inc., and is a partner in the Vance Company. Both were added as parties by amended complaint in 1978.

After the close of Plaintiffs' case, counsel for Plaintiffs moved to add Southeast Promotion, Inc. as an additional party Plaintiff in this action. Although the Court recognizes that this motion would have been more timely if presented earlier in the case, since no prejudice results to Defendant in the presentation of its case in full, the Court in its discretion and in accordance with Fed.R.Civ.P. 21 GRANTS Plaintiffs' motion to add Southeast Promotion, Inc. as a party Plaintiff. Southeast Promotion, Inc. was a Georgia corporation originally incorporated as Vance & Begner, Inc. in June 1960. The name of the corporation was changed in August 1961 and remained Southeast Promotion, Inc. until the corporation's dissolution on May 28, 1976. Southeast Promotion, Inc. did business as "Robert B. Vance & Associates" and all checks from the Defendant Baronet Corp. payable to Robert B. Vance & Associates were deposited into the bank account maintained by Southeast Promotion, Inc. The corporation filed state and federal income tax returns throughout the period relative to this litigation and always included in its income the proceeds paid by the Baronet Corp. to Robert B. Vance & Associates. The corporation was dissolved and its assets liquidated before the commencement of this litigation. It is a party Plaintiff to this action pursuant to Ga.Code Ann. § 22–1325.

Defendant Baronet Corp. is a corporation organized and existing under and by virtue of the laws of the State of New Jersey. In the mid-1970's Baronet became a wholly-owned subsidiary of Defendant Continental Grain. The Court dismissed Continental Grain as a Defendant in this action after the close of the Plaintiffs' case, there having been no convincing showing of any actions taken by Continental Grain Company relative to the circumstances which constitute the subject of this litigation. Although the Plaintiffs showed that officials of Baronet Corp. conferred with officials of Continental Grain Company on a regular basis several times yearly, there was no showing that Continental Grain Company participated in any of the decision-making involved in the day-to-day business of Baronet Corp. or was in any way involved in the relationship between the Plaintiffs and the Defendant Baronet.

### B. THE TRADEMARK IN QUESTION

Southeast Promotion, Inc., doing business as Robert B. Vance & Associates, was from the mid-1960's onward engaged in the sale of promotional items to be used by financial institutions. The most substantial item sold by Robert B. Vance & Associates was a clutch purse which incorporated space for a checkbook. The Plaintiffs have over the course of their manufacture of clutch purses used various trademarks which they have had federally registered. The application to register "Check ✓ Clutch" with the U.S. Patent Office was filed on December 12, 1966 by "Robert B. Vance & Associates, a Partnership". According to the application the trademark was first used by the applicant on December 7, 1966. The application

was verified by Robert B. Vance, who declared he was a partner in the applicant partnership.

On October 27, 1967, the Patent Office Examiner notified the applicant that the term "Clutch" must be disclaimed in order to register the trademark, stating: "Upon examination of the literature submitted . . . the term 'Clutch' is believed merely descriptive of the goods. The adjective 'Clutch' is defined, inter alia, as 'of a woman's handbag lacking handles and of a size and shape suitable for clasping in the hand.' See: Webster's Third New International Dictionary." On April 15, 1978, the applicant amended its application to disclaim the term "Clutch". The Patent Office in October of 1968 issued Registration No. 858140 for the trademark "Check√ Clutch".

On March 30, 1974 Mr. Vance signed and filed with the Patent Office an affidavit required by 15 U.S.C. § 1065 to establish incontestability. In the affidavit Mr. Vance swore that "Robert B. Vance & Associates, a Corporation" was the owner of the registration. The Patent Office withheld acceptance of the affidavit due to the discrepancy between the original registrant, a partnership and the affiant, a corporation. Mr. Vance had executed and filed with the Patent Office a sworn document purporting to be an assignment of the mark and its registration from "Robert B. Vance & Associates, a Partnership" to "Robert B. Vance & Associates, Inc., a Corporation". The assignment, which is dated November 8, 1974, recites that the actual assignment of rights in the mark took place on March 20, 1970, the day on which Robert B. Vance & Associates, Inc. was incorporated. After receiving the assignment instrument, the Patent Office accepted the § 1065 affidavit. Until its dissolution on May 28, 1976, Southeast Promotion, Inc., doing business as Robert B. Vance & Associates, was the user of the mark.

## C. THE BUSINESS RELATIONSHIP BETWEEN THE PARTIES

In 1968 Plaintiffs Vance and Begner contacted Defendant Baronet concerning the production of clutches which incorporated space for checkbooks. Baronet, engaged in the manufacture and sale of ladies' personal leather goods, had been manufacturing this type of clutch at least since 1967. The first purchase of Baronet products by Robert B. Vance & Associates was the purchase of an item which was in the Baronet line. From 1968 through the summer of 1976 Baronet manufactured checkbook clutches for Plaintiffs on a regular basis. Although there was no written contract between the parties, a relationship was established on the basis of oral agreement and course of dealing.

Robert B. Vance and/or Selwyn G. Begner discussed with employees of Baronet the styles and patterns of ladies' clutches which they proposed to offer to financial institutions. Baronet would manufacture these clutches and emboss on them the mark "Check √ Clutch". The quality of the clutches manufactured was controlled by both the Defendant Baronet Corp. in the manufacturing process and the Plaintiffs, by virtue of their input as to complaints from customers and salespersons and possible modifications which they thought would result in a higher quality product.

Southeast Promotion, Inc. had commission salesmen who called on financial institutions and solicited orders for the "Check √ Clutch" purses sold by the corporation. Salesmen of Southeast Promotion would solicit orders for the purses in the name of Robert B. Vance & Associates, which would be sent to the office of Southeast Promotion. Someone in the office would then prepare an order form to Baronet stating further the quantity and price with instructions for delivery to the bank customer.

Baronet would fill the order and deliver it to the bank customer with an invoice payable to Baronet, with a notation that the price had been established by Robert B. Vance & Associates. It would then pay to Robert B. Vance & Associates on a scheduled basis the difference between the price invoiced to the customer and the price it charged to Robert B. Vance & Associates, as was established from time to time. Bar-

onet was not the only manufacturer producing purses for Robert B. Vance & Associates; it was, however, their primary manufacturer, manufacturing the large majority of purses sold by Plaintiffs.

From the beginning of the relationship until November of 1975, Baronet did not undertake any marketing or sales effort to financial institutions. Throughout such time, however, Baronet did sell clutches to department stores and other retail outlets. During the time period set forth, any inquiries received by Baronet from banks about clutches were forwarded to Robert B. Vance & Associates. Baronet did not sell clutches with room for a checkbook bearing the trademark "Check ✓ Clutch", except on orders placed by Robert B. Vance & Associates or on occasions when with the permission of Robert B. Vance and/or Selwyn G. Begner such sales were made because of an overstock of the items in Baronet's warehouse.

During the period between 1970 and mid-1975 the nature of Southeast Promotion, Inc.'s business changed in terms of the customers to whom it was selling Baronet's products. During the early period, approximately 90% of the sales made were directly to banks and only about 10% of Plaintiffs' sales were to check printing companies. By mid-1975, however, approximately 90% of Plaintiffs' sales were to check printing companies and only 10% to banks. Check printing companies would purchase from Southeast Promotion, Inc. and in turn resell to banks which were customers of the check printers.

In the fall of 1972 Albert R. Steinberg who had been President of Baronet, left the corporation and Lawrence A. Cohen was brought in as President in February 1973. In the fall of 1974 there were discussions among Messrs. Cohen, Vance and Begner about the possibility of Baronet acquiring Southeast Promotion, Inc.; Baronet declined to purchase the company.

In late fall of 1975, Mr. Cohen met with Messrs. Vance and Begner; the substance of the discussions which took place is disputed. Mr. Cohen testified that at that time he notified the Plaintiffs that Baronet was interested in marketing clutches directly to financial institutions and was affirmatively looking into this prospect. According to the testimony of Messrs. Vance and Begner, Mr. Cohen merely asked whether it would be okay to market clutches to financial institutions in certain areas of the country which it did not feel were adequately represented by Robert B. Vance & Associates. Plaintiffs at that time told Mr. Cohen that such action by Baronet would be unacceptable. From all of the testimony, and the lack of any documentary evidence supporting Mr. Cohen's testimony regarding this meeting, the Court finds that at the meeting of November, 1975, Mr. Cohen did not apprise the Plaintiffs of Baronet's intention to begin marketing checkbook clutches to financial institutions in the near future.

Subsequent to Mr. Cohen's meeting with Messrs. Vance and Begner, Baronet Corp. through its President, Lawrence Cohen, hired Richard Gould as a sales manager. Mr. Gould was hired to establish a direct sales force to sell checkbook clutches to financial institutions. Mr. Cohen turned over to Mr. Gould the computer records showing the names and addresses of Plaintiffs' customers that were supplied by Baronet. In addition, Mr. Cohen supplied Mr. Gould with the names of Southeast Promotion, Inc.'s salespersons. Mr. Gould called on several of the salespersons who sold "Check ✓ Clutches" for Robert B. Vance & Associates, Inc. In addition, Mr. Gould supplied his sales force with the information contained in Plaintiffs' customer lists. Mr. Gould and his sales force thereupon called upon Plaintiffs' customers except for the check printing companies whom they did not call upon until six months thereafter. The clutches sold to financial institutions by Baronet's sales force were checkbook clutches from a line designed by Baronet specifically for sale to financial institutions. Although these clutches were similar to ones sold by Robert B. Vance & Associates and similar to ones sold by other manufacturers of checkbook clutches, they were not

identical to those manufactured by Baronet for Robert B. Vance & Associates, and did not bear the trademark "Check√Clutch".

Plaintiffs were not notified of the sales efforts by Baronet in the area of financial institutions until they were so apprised by their own sales representatives and customers. Baronet Corp. at all times accepted, filled and shipped orders from Plaintiffs, even when it was simultaneously calling on the same customers. At about the same time that Baronet began selling checkbook clutches to financial institutions, orders from Robert B. Vance & Associates to Baronet dropped sharply. Robert B. Vance & Associates stopped ordering from Baronet in July, 1976. After the relationship between the parties was conclusively terminated, Baronet found itself in the possession of unsold checkbook clutches bearing the trademark "Check√Clutch" which had been manufactured for Robert B. Vance & Associates. These check clutches were sold by Baronet to retail outlets with gold gummed labels bearing the script term "Check Clutch" affixed to the clutch purses so as to cover the trademark "Check√Clutch".

Plaintiffs' allegations that Baronet supplied Robert B. Vance & Associates with increasingly inferior merchandise beginning in late 1974 were not substantiated by the evidence. Quality problems did occur with the merchandise but they were not of an extraordinary nature nor did they appear to noticeably increase in numbers over the term of the relationship between the parties.

D. THE TERM "CHECK CLUTCH"

In connection with its manufacture and sale of checkbook clutches, Baronet has never used the term "Check Clutch" for the purpose of identifying Baronet's particular checkbook clutches, as distinguished from the checkbook clutches of other leather goods manufacturers. Beginning as early as 1967, Baronet has used the term "Check Clutch" interchangeably with the terms "Checkbook Clutch", "Clutch Checkbooks", "Check-Mate Clutch", "Checking Clutch" and other variations, but only for the pur-

pose of describing to prospective purchasers the type of goods offered for sale, i. e., a clutch with a place for a checkbook. These terms have appeared in almost all Baronet catalogues since 1967, alongside and in the same typeface as "French Purse", "Billfold", "Key Case", etcetera. Other manufacturers of ladies' small leather goods have used the terms "Check Clutch", "Checkbook Clutch" and other variations throughout the years in their catalogues and advertisements. Retailers of ladies' leather goods have also used these terms in their advertising. According to the testimony of experts with long-standing association with the personal leather goods industry, the term "Check Clutch" signifies not Robert B. Vance & Associates or Southeast Promotion, Inc., the manufacturer of "Check√Clutch" purses, but rather, a clutch purse with room for a checkbook.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION

This Court has jurisdiction over the subject matter and the parties to this action and venue is properly laid in this district. 15 U.S.C. § 1121; 28 U.S.C. § 1338; 28 U.S.C. § 1391(b)–(c).

### B. LANHAM ACT

■■ As a general rule, if a trademark has become incontestable under 15 U.S.C. § 1065, as in the instant case, the mark's registration serves as conclusive evidence of the registrant's exclusive right to use the registered mark. 15 U.S.C. § 1115. The Lanham Act does, however, set forth seven defenses that may be raised in an infringement action in which the registrant's mark has become incontestable. The provision upon which Defendant Baronet Corp. relies in this action provides a defense to an infringement action if "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party . . . ." 15 U.S.C. § 1115(b)(4). In order for De-

fendant Baronet to successfully assert the "fair use" defense, the Court must find that the mark "Check ✓ Clutch" is a descriptive term.

■ There are four categories of trademarks: generic, descriptive, suggestive, and arbitrary or fanciful. A generic mark refers to "the common descriptive name of an article or substance", 15 U.S.C. § 1064. A mark which is descriptive conveys a clear idea of the characteristics or qualities of the goods. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2nd Cir. 1976). Suggestive marks fall somewhere in between marks which are descriptive and marks which can be termed fanciful or arbitrary. Rather than describing the characteristics of the goods in question, a suggestive term merely suggests those characteristics; an effort of the imagination is required to reach a conclusion as to the nature of the goods. *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115–16 (5th Cir. 1979). A fanciful or arbitrary trademark bears no relationship to the goods; it may consist of a word or words invented solely to be used as a trademark or words which are used in an unusual manner. *Id.* at 116; *Abercrombie & Fitch, supra*, at 11 n. 12. Plaintiffs' trademark "Check ✓ Clutch" which was used on their clutches which have a space for a checkbook, is clearly not fanciful, arbitrary, or suggestive. Rather, it is a mark which is at best descriptive; the term "Check Clutch", which is the dominant part of the mark clearly conveys to the purchaser the idea that the product in question is a clutch which has room for a checkbook. Although it is perhaps not as graphically descriptive as other similar terms might be, such as "checkbook clutch", no leap of the imagination is needed to arrive at a correct conclusion as to the nature of the goods in question.

■ Having found that the Plaintiffs' trademark is a descriptive one the Court now turns to the question of whether Defendant Baronet Corp.'s use of the descriptive term "Check Clutch" was the use of the term as a trademark, or was rather a fair and good-faith use of the term in a descrip-

tive manner. All of the evidence substantiates Baronet's assertion that it has used the term "Check Clutch" not as a trademark, but in a descriptive manner as a means of conveying the nature of the goods that Baronet was selling. The evidence showed that Baronet sold clutch purses which were functionally similar to those sold by the Plaintiffs. In numerous of their catalogues and advertisements from 1967 onward Baronet used the term "Check Clutch" as well as similar terms such as "Checkbook Clutch", "Checking Clutch", etcetera, to describe the merchandise advertised, in the same manner that other terms such as "Key Case" and "Mini-Clutch" were used. The other instances in which the Defendant used the term "Check Clutch" were when it affixed gold labels bearing the term to merchandise which had been originally produced for Robert B. Vance & Associates. Although this is not as clear a use of the term in a descriptive sense, the Court finds that this use was also a fair and good-faith use by Defendant of the term only to describe the goods, and was not used as a trademark. Defendant's "fair use" of the term "Check Clutch" not as a trademark but merely as a descriptive term serves to defeat Plaintiffs' claim for trademark infringement.

## C. FEDERAL AND COMMON LAW UNFAIR COMPETITION

■ Defendant's establishment of the "fair use" defense defeats a claim not only for trademark infringement, but also precludes a recovery under 15 U.S.C. § 1125(a) for federal unfair competition. Even if Defendant had not proven a fair and good-faith descriptive use of the term "Check Clutch", however, the Plaintiffs would still not be entitled to recover under 15 U.S.C. § 1125(a). In order for Plaintiffs to be entitled to recovery under 15 U.S.C. § 1125(a), they must prove that their descriptive trademark has acquired a secondary meaning. See *Rolls Royce Motors, Ltd. v. A & A Fiberglass, Inc.*, 428 F.Supp. 689 (N.D.Ga.1976). Plaintiffs' evidence failed to establish that the mark "Check ✓ Clutch" has acquired a secondary meaning, i. e., that

the term "has become distinctive of the applicant's goods in commerce." 15 U.S.C. § 1052(f). In order to establish secondary meaning, Plaintiffs must show that the primary significance of the term in the minds of the consuming public is "not the product but the producer". *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 118 (5th Cir. 1979). As a result of the descriptive nature of the Plaintiffs' trademark and the consuming public's recognition of the term as signifying the product rather than the producer, the Defendant Baronet Corp. cannot be held under 15 U.S.C. § 1125(a) to have used "a false designation of origin, or any false description or representation" in advertising similar goods as "Check Clutch" purses or any variation thereon.

■ The Georgia statute setting forth a cause of action for unfair competition, Ga. Code Ann. § 37–712, requires as an element of the fraud, the "intention of deceiving and misleading the public . . . ." Defendant Baronet Corp., while using the term "Check Clutch" and similar terms to describe its merchandise in its advertising, did not do so with the intent to deceive or mislead the public. The term, "Check Clutch" was used merely to describe the type of merchandise offered, in the same manner that other terms, such as "French Purse", "Key Case", and "Mini-Clutch" were used. Accordingly, Plaintiffs' claim of common law unfair competition must fail.

## D. TRADEMARK DILUTION AND DECEPTIVE TRADE PRACTICES

■ Ga.Code Ann. § 106–115 provides for injunctive relief in cases in which there is use of the same or similar mark if there exists a likelihood of injury to the prior user's business reputation or dilution of the distinctive quality of the prior user's mark. The only significant use of the term "Check Clutch" by the Defendant has been in its advertising to its retail customers. This use has not been shown to have injured the business reputation of the Plaintiffs. The descriptive nature of the Plaintiffs' mark "Check ✓ Clutch" and their failure to prove

secondary meaning precludes them from recovering for the dilution of the "distinctive quality" of their mark. *Dolphin Homes Corp. v. Tocomc Development Corp.*, 223 Ga. 455, 458, 156 S.E.2d 45 (1967).

Plaintiffs' allegations of deceptive trade practices while never specifically enumerated in any of the pleadings appeared at trial to consist of allegations that Defendant Baronet had on at least two instances sold purses stamped with "Check ✓ Clutch" to retail customers without Plaintiffs' permission and that Baronet advertised its line of clutches which hold checkbooks under the name "Check Clutch" and various other similar names. The evidence did not show that Baronet at any time intended to pass off its line of so-called "Check Clutch" purses as the "Check ✓ Clutch" purses distributed by the Plaintiffs so as to violate Ga.Code Ann. § 106–702(1). Rather, Baronet has used the term not as a trademark, but in a descriptive manner as a means of conveying the nature of the goods being advertised. Since the mark "Check ✓ Clutch" is merely descriptive and has not acquired a secondary meaning, the use of the term "Check Clutch" by the Defendant in its advertising has not caused a "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" nor caused a "likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another . . . ." Ga.Code Ann. § 106–702(2)–(3).

■ Turning to the sale by Baronet of "Check ✓ Clutch" purses which it manufactured for Plaintiffs for distribution to financial institutions, the evidence shows that the Defendant Baronet did on at least two occasions sell such purses directly to its retail customers. The evidence also showed, however, that Baronet's sale of "Check ✓ Clutch" purses was on the first occasion made with the permission of the Plaintiffs. It is undisputed that after Plaintiffs stopped ordering the check clutch purses from the Defendant in the summer of 1976, Defendant Baronet sold its remaining stock of "Check ✓ Clutch" purses made

for Plaintiffs to its own retail customers. The evidence is also undisputed that the Defendant, prior to shipping these purses to its customers, covered the Plaintiffs' trademark which appeared on the purses with stickers which read "Check Clutch" printed in script. The use of these stickers substantially eliminated any likelihood of confusion or misunderstanding with respect to the source, sponsorship or approval of the goods, despite Plaintiffs' contention that these stickers could be easily removed from the purses, revealing the Plaintiffs' mark.

### E. BREACH OF CONTRACT AND USE OF CUSTOMER LISTS

 The oral contract entered into between the parties was indefinite as to its duration and thus was terminable at will. See 19 A.L.R.3d § 9 and cases cited therein; *Corbin on Contracts*, § 96 (1963). Plaintiffs do not deny that the contract should be so construed; they contend, however, that reasonable notice of termination was required. Although the actions of Baronet in selling its line of checkbook clutches to financial institutions did not serve to terminate the contract, the course of action did serve to significantly modify the contract as understood by the parties. Under said circumstances it is only equitable to require the party making the modification to serve reasonable notice upon the other party. While the President of Baronet claimed that he gave Plaintiffs notice in the fall of 1975 of Baronet's decision to sell checkbook clutches to financial institutions, and then did not begin selling to financial institutions until approximately February of 1976, the Court found that reasonable notice of Baronet's intention to compete with Plaintiffs in the business of financial institutions was not given to the Plaintiffs. Despite the lack of prior notice, Plaintiffs failed to prove at trial how, if at all, they were damaged by the failure of the Defendant to provide such reasonable notice. This failure of proof precludes recovery for failure to provide reasonable notice.

 Defendant's use of the information contained in Plaintiffs' customer lists for its own advancement and in competition with Plaintiffs constituted a tort. "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if . . . (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him. . . ." *Restatement of Torts*, § 757 (1939). See also *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974); *Stewart v. Hook*, 118 Ga. 445, 45 S.E. 369 (1903). The Court recognizes that customer lists which are simply compilations of public information and which could be as easily compiled by third parties would not be deemed to constitute trade secrets. However, where, as in the instant case, the party compiling the customer lists, while using public information as a source, i. e., names of banks, expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection.

 Plaintiffs over the course of several years developed lists of financial institutions which were in the market for their particular line of goods, checkbook clutches. These lists were given to Baronet with the understanding that they were to be used in connection with the manufacture by Baronet of "Check ✓ Clutch" purses to be sold by the Plaintiffs. The tortious use of the customer lists by Baronet was not only for its own advancement but was in direct conflict with Plaintiffs' interests. Although Mr. Cohen testified that Mr. Gould went beyond his instructions in providing the customer lists to his sales force, it appears evident that the purpose of providing such information to Mr. Gould was so that he could use it in his sales efforts and such use should have been expected and was in effect condoned and promoted by ensuring the availability of the lists. The nature of the business relationship between the parties, the amount of time and effort put into developing the customer lists in question, and the use by Baronet of these lists to promote its own interests at a period of time in which it

was also promoting the interests of the Plaintiffs all support a finding of liability.

The Court is unable from the testimony provided at trial to measure the damages in terms of the loss suffered by the Plaintiffs. Specific injury to the Plaintiffs in terms of lost sales from the tortious use of the customer lists was not established. The clearest measure of damages in the instant case would be the value of the customer lists to Baronet. Following this approach, the Court would look to the benefits, advantages, or profits gained by the Defendant in the use of the customer lists rather than any loss suffered by the Plaintiffs. See *University Computing Co., supra,* at .535–36. Defendant Baronet would thereby be liable to Plaintiffs in the amount of profits gained by virtue of Baronet's sale to financial institutions which were on the customer lists of the Plaintiffs which were used by Baronet. The only testimony addressing this point was uncontradicted; in 1976 the Defendant Baronet made sales to customers from Plaintiffs' customer lists in the amount of $9,000.00 net of commissions and returns. However, there was no testimony from which the Court could determine the percentage of the $9,000.00 which represents the profit actually enjoyed by the Defendant. This failure of proof precludes recovery for Defendant's tortious use of Plaintiffs' customer lists.

## F. CANCELLATION OF THE REGISTRATION

Defendant has counterclaimed in this action for cancellation of the registration of Plaintiffs' mark "Check ✓ Clutch" in accordance with 15 U.S.C. § 1119 which grants the Court the power to order the cancellation of registrations in actions involving registered marks. The section of the Lanham Act setting forth the grounds for cancellation, 15 U.S.C. § 1064, provides in part that cancellation may be sought "at any time if the registered mark becomes the common descriptive name of an article or substance, or has been abandoned, or its registration was obtained fraudulently . . . ." 15 U.S.C. § 1064(c).

This Court does not believe that the cancellation of a trademark registration should be undertaken lightly by the court in trademark actions. Although Defendant argued abandonment at trial, it did not prove Plaintiffs' intent to give up the rights to the mark nor did it show substantial non-use of the mark. See 15 U.S.C. § 1127. As the Court does not find the mark "Check Clutch" to be a generic mark, the registration therefore cannot be cancelled on the grounds that it is the "common descriptive name of an article".

The remaining ground for cancellation which Defendant asserts and on which it relies most heavily is fraud. In support of its allegations of fraud, Defendant points to several representations made by Plaintiffs in the filing of the registration and the affidavit under 15 U.S.C. § 1065 as well as alleged concealments. In particular, Defendant alleges that the term "Check ✓ Clutch" was generic in nature at the time of registration and that Plaintiffs concealed this fact in the application for registration. Since this Court does not find that the term "Check ✓ Clutch" was a generic term at the time of registration or at any time thereafter, but has always been a descriptive term, a finding of fraud cannot be predicated upon this allegation of concealment.

Nor can a finding of fraud be based upon Plaintiffs' representations in the application for registration that no other person had the right to use said mark in commerce. Defendant has a heavy burden of proof to prove fraud in the procurement of a registration. *W. D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.,* 377 F.2d 1001, 54 C.C.P.A. 1442 (1967). Defendant failed to carry that burden at trial. The elements of affirmative fraud that need to be alleged and proven by the Defendant are: (1) a false representation regarding a material fact; (2) knowledge or belief that the representation is false; (3) intention to induce reliance upon the misrepresentation; (4) reasonable reliance upon the misrepresentation; and (5) damage proximately resulting from such reliance. *Prosser, Law of Torts,*

§ 105 (4th Ed. 1971). Although Plaintiffs' statement may have been false, this does not require a finding that the statement was fraudulent. Defendant failed to prove that the Plaintiffs knew or believed that the representation was false, and this Court's finding that the term is descriptive and has acquired no secondary meaning does not have any bearing on Plaintiffs' state of mind at the time the application for the registration was filed. Finally, at trial Defendant argued that the registration should be cancelled because of the discrepancy which existed between the original registrant and the affiant which filed an affidavit under 15 U.S.C. § 1065 to establish incontestability. Although the facts of this case reveal that Plaintiffs may have failed to use the necessary care in their dealings with the U. S. Patent Office, they do not support a finding of fraud.

In summary, the Court GRANTS Plaintiffs' Motion to Add Southeast Promotion, Inc. as a party Plaintiff. The Clerk is DIRECTED to enter final judgment for Defendant on all counts, with each party to bear its own costs, and DIRECTED to enter judgment for Plaintiffs on Defendant's counterclaim to cancel the trademark registration.