**BURGER KING CORPORATION, Plaintiff,**

v.

**PILGRIM'S PRIDE CORPORATION, Defendant.**

**PILGRIM'S PRIDE CORPORATION, Plaintiff,**

v.

**BURGER KING CORPORATION, Defendant.**

No. 87–0610–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Dec. 2, 1988.

Alan Greer, Diane W. Katzen, Miami, Fla., William D. Raman and Louis T. Pirkey, Austin, Tex., for plaintiff.

Malin, Haley & McHale, Ft. Lauderdale, Fla., for defendant.

## MEMORANDUM OPINION

SPELLMAN, District Judge.

### ORDER DENYING MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

THIS CAUSE comes before the Court upon Defendant's Motion for Judgment Notwithstanding the Verdict. Upon careful review of the record, the legal arguments of counsel, and the trial transcript, this Court makes the following determinations.

### A. BACKGROUND

This is an action for false designation of origin and/or false description or representation (infringement of an unregistered mark) under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); for common law trademark infringement and unfair competition; and for dilution under Florida law. The basic thrust of the action is that the adoption and use by the Defendant, PILGRIM'S PRIDE, of the terms "Chicken Tenders" and "Chicken Breast Tenders" infringes upon the rights and goodwill owned by the Plaintiff, BURGER KING, in its mark "Chicken Tenders."

This matter was heard by a jury on August 2 through 11, 1988, in proceedings in which all parties appeared and were represented by counsel. On August 11, 1988, the matter of liability was submitted to the jury through seven special interrogatories and the jury returned its verdict in favor of the Plaintiff, on each of the seven special interrogatories.

The Defendant asks this Court to enter judgment for the Defendant, notwithstanding the verdicts by the jury on the ground that there was insufficient evidence for those verdicts. The Defendant asserts that the evidence at trial showed the opposite to be true with regard to each finding.

### B. STANDARD OF REVIEW

The standard for consideration of a motion for judgment notwithstanding the verdict requires a review of all of the evidence in the light most favorable to the non-movant. *Michigan Abrasive Co. v. Poole*, 805 F.2d 1001, 1004 (11th Cir.1986); *Neff v. Kehoe*, 708 F.2d 639, 641 (11th Cir.1983). This standard does not permit a reweighing of the evidence, or the discounting of any credible evidence. *Rabun v. Kimberly–Clark Corp.*, 678 F.2d 1053, 1057 (11th Cir.1982).

The jury findings in this case were as follows:

1) HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT CHICKEN TENDERS IS NOT GENERIC?

YES

2) HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT THE TERM "CHICKEN

TENDERS" ACQUIRED A SECONDARY MEANING BY AUGUST 12, 1986?
YES

3) HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT PILGRIM'S PRIDE'S USE OF THE TERM CHICKEN TENDERS IS LIKELY TO CAUSE CONFUSION?
YES

4) HAS PILGRIM'S PRIDE PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT ITS USE OF THE TERM "CHICKEN TENDERS" AND "CHICKEN BREAST TENDERS" IS A FAIR USE?
NO

5) HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT PILGRIM'S PRIDE'S USE OF THE TERM "CHICKEN TENDERS" AND "CHICKEN BREAST TENDERS" WILLFULLY INFRINGED THE RIGHTS OF BURGER KING?
YES

6) HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT PILGRIM'S PRIDE'S USE OF THE TERM "CHICKEN TENDERS" AND "CHICKEN BREAST TENDERS" IS LIKELY TO DILUTE BURGER KING'S MARK UNDER FLORIDA LAW?
YES

7) HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT PILGRIM'S PRIDE AND COMMITTED UNFAIR COMPETITION?
YES

The Court, in considering this motion, must view the evidence in the light most favorable to the Plaintiff, BURGER KING, and establish whether any credible evidence supports each of the above jury's findings.

1. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

## C. THE TRADEMARK

The Defendant is arguing in its motion that the only trademark that Burger King has established is a composite mark: BURGER KING CHICKEN TENDERS AND DESIGN. Therefore, no trademark rights can accrue in the term "Chicken Tenders" alone.

The Plaintiff responds that the mark at issue is and has always been "Chicken Tenders" and the fact that it is used on their boxes along with the logo and the company name does not mean that the trademark is a composite mark. Additionally, the Plaintiff points out that this issue was never properly raised pre-trial and cannot be raised at this time. *Combee v. Shell Oil Company,* 615 F.2d 698 (5th Circuit 1980).[1]

Because this is a Motion for Judgment Notwithstanding the Verdict, the standard of review, as explained above, goes to the jury findings. The jury in this case did not have the issue of the composite mark before it. It did, however, find that the Defendant had infringed on the Plaintiff's trademark rights in the term "Chicken Tenders". Therefore, this Court must examine each of the jury findings to see if any credible evidence was proffered by the non-moving party. *Rabun v. Kimberly Clark Corp.,* 678 F.2d 1053, 1057 (11th Cir.1982).

## D. THE JURY FINDINGS

### 1. HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT CHICKEN TENDERS IS NOT GENERIC?

There are two distinct ways in which words may be classified as generic. *Gimix, Inc. v. J.S. & A. Group, Inc.,* 699 F.2d 901 (7th Cir.1983). One way is where the term under scrutiny began life as a "coined" term.[2] The second way is where

2. An example of a "coined" term is "aspirin," where the term was first used by Bayer Drug Company and later entered the public domain. *Bayer Drug Co. v. United Drug Company,* 272 F. 505 (S.D.N.Y.1921).

a term was "commonly used and commonly understood prior to its association with the product or products at issue." *Gimix* at 905. Where a mark is not registered, there is no presumption of validity and the Plaintiff has the burden of proving that its mark is not generic. *Reese Publishing Company, Inc. v. Hampton International Communications, Inc.,* 620 F.2d 7, 11 (2d Cir. 1980).

Here, the Defendant argues that the term "Chicken Tenders," was not a coined term, but was commonly used and commonly understood as part of a chicken, long before the Plaintiff's first use of the term in 1985. The term "Chicken Tenders" alone is not distinctive but rather refers to an anatomical part of a chicken, and has been used that way extensively by third parties for decades. Therefore, the Defendant asserts that the term "Chicken Tenders" is a generic term and that the evidence presented at trial supports this position.

The dictionaries introduced into evidence at the trial contained no definition of the word "tender" as a cut of meat; however, the evidence showed that the word combination "Chicken Tenders" was descriptive of the Plaintiff's product. The testimony elicited from the president of Burger King established that the Plaintiff adopted the term "Chicken Tenders" because it was "looking for it to suggest certain attributes of a product" and that he would not have selected a name for the product that would not have remained the property of the Plaintiff.

The evidence also included testimony that the general public would not understand the word "tender" to designate a particular part of a chicken. Therefore, although there was evidence that the term "tender" might be generic within the chicken industry, it was not generic among the general public. The test of genericness in trademark law is the term's meaning to a usual buyer or other relevant members of the public. *H. Marvin Ginn Corp. v. In-*

*ternational Association of Fire Chiefs, Inc.,* 782 F.2d 987, 989 (Fed.Cir.1986). Here, such relevant members of the public would be the retail consumers. There was significant testimony that there was no use of the term "chicken tenders" at the retail level prior to the Plaintiff's use.

The Defendant objected at trial to the introduction of the Chilton survey as evidence of either the genericness of the term "Chicken Tenders" or as evidence of secondary meaning (this latter objection was sustained). The Defendant objected to the survey as evidence of nongenericness on two major grounds: 1) that there was significant third party use of the term at the time of the survey; and 2) that the product category was not identified.

The Defendant argues that at the time of the survey, there were numerous third party users. The survey was conducted in November, 1987, and thus had no ability to go backwards in time to the point at which the Plaintiff first began using that term. In other words, the survey could only be used to show that the term was non-generic at the time that the survey was taken, and not at the critical time period of the Plaintiff's first use.

▮ Therefore, the Defendant asserts that the Plaintiff cannot use the Chilton survey to show non-genericness of the term "Chicken Tenders" alone, when a plurality of composite uses existed at the time the survey was taken. At trial, this Court specifically allowed the survey as evidence to prove non-genericness, and stated that the Defendant's objections to the survey went to the weight to be given to the survey, and not its validity. This is still this Court's position.

The second objection is that the survey's questionaire did not identify the product category.[3] The survey is defective because those surveyed were not told the category of product in regard to the term "Chicken Tenders." Therefore, the responses contained in the survey are entirely meaning-

---

**3.** For example, "apple" may be descriptive/generic for an fruit, but "Apple" may be non-generic when used as the name of a computer.

less. *A.J. Canfield Company v. Honickman*, 808 F.2d 291, 302–303 (3d Cir.1986).

The Plaintiff points out that the failure to identify the product category actually enhances the credibility of the survey. If, in fact, the product has a generic meaning to consumers, then that generic term will be the first in mind and the most likely response from the consumer. Accordingly, the fact that 60% of those surveyed answered that "Chicken Tenders" is a brand name, and not a common (or generic) name, is actually reinforced by the lack of a product category.

■ This argument again goes to the weight of the survey and not to its validity. The Chilton survey methodology is patterned after other surveys that have been judicially scrutinized and approved by other courts. *E.I. DuPont de Nemours & Company v. Yoshida International, Inc.*, 393 F.Supp. 502 (E.D.N.Y.1975)[4]. The Defendant argues that the survey was not patterned after the *Teflon* survey because the terms used in the second part of the survey were all either well-advertised fast food items or non-advertised items. This again goes to the weight of the evidence, and not its underlying validity. The survey simply asked if certain terms were brand names or common (generic) names. The fact that the persons surveyed recognized well-advertised items as brand names is almost inevitable but does not fatally flaw the survey. The Defendant suggests that the survey points the respondent to items associated with fast food restaurants. In other words, the reason "Chicken Tenders" was recognized as a brand name was because it was put in a category with other well-advertised fast food items. The other two items were made-up names: chicken hot dogs and prime roaster parts. This Court does not agree that this is a question that goes to the validity of the survey. Instead, it seems uniquely a matter of the weight to be given to the survey. Additionally, there was sufficient other evidence at trial to establish that the term "Chicken Tenders"

was in fact not generic to the general public.

## 2. HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT THE TERM "CHICKEN TENDERS" ACQUIRED A SECONDARY MEANING BY AUGUST 12, 1986?

A term can be generic, merely descriptive, suggestive, arbitrary, fanciful or coined. *Kresge Company v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir.1979). The Defendant first argues that even assuming that the term "Chicken Tenders" is not generic, the Plaintiff has not proved that the term is merely descriptive because a non-generic term may still be merely descriptive, suggestive, arbitrary, fanciful or coined. The Defendant states that the Plaintiff must define the non-generic term before any of the secondary meaning evidence is at all relevant. Thus, here, where the Plaintiff is asserting that the term is merely descriptive and therefore requires a secondary meaning, the Plaintiff must first prove that the term *is* merely descriptive.

The Plaintiff conceded that the term was not suggestive, arbitrary, fanciful or coined, and therefore has to be either generic or merely descriptive. The Defendant claims that this concession was faulty because the Defendant never stipulated to or accepted this concession. The Defendant now demands that the Plaintiff prove that the term is merely descriptive.

The Plaintiff responds that this argument is without merit. The Plaintiff has already proven that the term is non-generic. Therefore, the term must be merely descriptive, suggestive, arbitrary, fanciful or coined. If the term is suggestive, arbitrary, fanciful or coined, then the Plaintiff would not be required to prove secondary meaning and it acquired trademark rights immediately upon use of the mark "Chicken Tenders." *University of Georgia Athletic Association v. Laite*, 756 F.2d 1535,

---

**4.** The survey in this case is known as the *Teflon* survey because that Court held that the word "Teflon" was non-generic.

1540 (11th Cir.1985). By conceding that the mark is merely descriptive, the Plaintiff placed a higher burden of proof upon itself.

Additionally, there was evidence presented at trial that the reason that the name was chosen was that it was meant to suggest certain attributes of the product, and thus was merely descriptive. A term that is merely descriptive describes qualities or characteristics of a product or service. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Here, the word "tenders" used in the term "Chicken Tenders" does describe an attribute or characteristic of the product. There was also expert testimony to the fact that in the expert's opinion, the Plaintiff had proven that the term was merely descriptive. The expert also testified that, in his opinion, the term had acquired secondary meaning by June, 1986 due to its continuous and substantially exclusive use from November of 1985 to June of 1986.

The issue of whether a term has acquired secondary meaning is a question of fact for the jury. *American Television and Communications, Corp. v. American Communications and Television, Inc.,* 810 F.2d 1546, 1549 (11th Cir.1987). In determining whether a term has acquired secondary meaning entitling it to trademark protection, the following factors must be considered: 1) length and manner of its use; 2) nature and extent of advertising and promotion; 3) efforts made by the Plaintiffs to promote conscious connections in the public's mind between the name and the Plaintiff's product or business; and 4) extent to which the public actually identifies the name with the Plaintiff's product or venture. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 (11th Cir.1984).

The Defendant realleges the composite mark defense: that Burger King only used the composite mark "Burger King Chicken Tenders" and therefore could only acquire a secondary meaning in that composite mark. This argument has been discussed previously. Second, Plaintiff contends that all its advertising and promoting of the product was under the mark "Chicken Tenders" alone. The use of the Burger King name and logo did not apply to the secondary meaning.

■ The evidence shows that the term "Chicken Tenders" was used alone in television and print advertising, and on the translights. The Defendant states that because "Chicken Tenders" alone was not the sole beneficiary of the millions of dollars spent in advertising after March, 1986, the term "Chicken Tenders" acquired no secondary meaning; however, the factors to be considered in determining whether secondary meaning has attached include whether the public has consciously connected the term "Chicken Tenders" with the Plaintiff's product *or* with the Plaintiff itself, i.e., Burger King. *Conagra* at 1513. There is no requirement that the mark be the "sole beneficiary" of the money spent on advertising.

The Defendant argues that the use of the term "Chicken Tenders" on the Plaintiff's translights is not sufficient to support a finding of secondary meaning. The translights are the point of purchase displays that are located above the counters where customers place their fast food orders. This, the Defendants argue, is too far removed from the product to connect the product itself with the term. The translights are not positioned next to or in very close proximity to the product "Chicken Tenders." The Defendant concludes that the translights are simply advertising and are not the type of trademark use required to acquire trademark rights.

■ When a customer enters Burger King, the customer must use the translights in order to choose the product, and at the same time is enticed into choosing the product from the translight. The name used on the translights is "Chicken Tenders." This is as close as it is reasonable to connect the product with the term "Chicken Tenders" in this type of industry. This type of use is sufficiently next to or in close proximity to the product. Thus this use was not too far removed from the product to allow the public to connect the term "Chicken Tenders" with either the Plaintiff's product or with the plaintiff,

Burger King, itself. Although the translights might not in and of themselves be sufficient to establish secondary meaning, they can be considered as a factor.

Even without the translights, there was sufficient other evidence at trial to establish secondary meaning. Although the Chilton Survey was not admitted to prove secondary meaning, the Plaintiff conducted several in-house surveys that showed that there was identification of the mark with the product and with the Plaintiff. In May, 1986, the Plaintiff's in-house survey showed that 16% of those surveyed, identified "Chicken Tenders" with Burger King. That figure was projected to reflect 16 million persons. In February, 1987, 53% of those surveyed recognized "Chicken Tenders" as a Burger King product. That figure projects to 35% of the total U.S. population, or 80 million persons. Although the Defendant objected to the February, 1987, survey as being outside the critical time period (the period ending in June, 1986), this Court found that this objection went to the weight of the evidence and instructed the jury accordingly.

■ Additionally, the expert witness testified that proof of intentional copying was probative evidence of secondary meaning. *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir.1983). The evidence established that the Defendant's commercials, produced after the Plaintiff's commercials were aired, and after the Defendant had ordered and viewed the Plaintiff's commercials, were very similar. Therefore, in view of all of the above evidence, there was sufficient credible evidence to support a jury verdict on the issue of secondary meaning.

### 3. HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT PILGRIM'S PRIDE'S USE OF THE TERM CHICKEN TENDERS IS LIKELY TO CAUSE CONFUSION?

The first argument that the Defendant raises is, again, the composite mark argument. The Defendant also argues that the term "Chicken Tenders" is generic and

therefore is not protectable. These arguments have been adequately disposed of in the previous sections.

The second argument is that no likelihood of confusion resulted from the Defendant's use of the mark "Chicken Tenders" because the products are too different. They are sold in different retail outlets, are in a different stream of commerce and are a different type of product. The Plaintiff sells hot, fast-food that is ready to eat; the Defendant sells a frozen food product that the consumer must take home to prepare. Additionally, there are many third party users.

The Defendant argues that its intent was not to cause confusion, but simply to fairly and adequately describe the product as real chicken. It argues that the only evidence the Plaintiff presented was that the Defendant had requested a copy of the Plaintiff's television ad. This, it claims, was an innocent review of publicly available data. It is standard practice in the industry to evaluate what others are doing in regard to marketing similar products. Additionally, the Defendant also obtained copies of other chicken food producers' advertisements.

The Defendant concludes that the absence of evidence of actual confusion is very probative that there is no likelihood of confusion. It is contended that here, a reasonable person could not be confused as to the source of either party's product. It is further asserted that the absence of any survey evidence as to this issue suggests that such a survey would be unfavorable.

The burden of proving the acquired trademark status rests with the alleged trademark owner. *National Conference of Bar Examiners et al. v. Multistate Legal Studies, Inc.*, 692 F.2d 478 (7th Cir. 1982); *Reese Publishing Co., Inc., v. Hampton International Communications*, 620 F.2d 7 (2d Cir.1980). In order to establish a likelihood of confusion, the factors that the jury must consider are: 1) type of trademark; 2) similarity of design; 3) similarity of the product; 4) identity of retail outlets and purchases; 5) similarity of advertising media used; 6) the defendant's intent; and 7) actual confusion. *Bo-*

naventure Associates v. Flyer Publishing Corporation, 621 F.Supp. 107 (S.D.Fla. 1985). In order to establish a likelihood of confusion, all factors do not have to be resolved in favor of the Plaintiff. *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir.1982).

The expert witness testified that in his opinion, there was a likelihood of confusion because 1) the Defendant had knowledge of the Plaintiff's prior use; 2) the Defendant adopted a mark as close as possible to the Plaintiff's mark; 3) the Defendant's package was as close as possible to the Plaintiff's package; and 4) the Defendant used the same theme—"the real thing"—as the Plaintiff. Thus, the expert concluded that an unwary purchaser could erroneously assume that the products emanated form the same source. The expert also stated that intentional copying is a factor to be considered in establishing a likelihood of confusion.

There was further testimony that although the Plaintiff did not sell, or intend to sell, any of its products in supermarkets, some of its competitors did—Wendy's and Howard Johnson's in particular. The testimony also showed that the Defendant's product could be prepared in 3½ minutes in a microwave oven and thus, if a customer at home had a fast food craving, it would be easier and quicker to fix the Defendant's product than to go to one of the Plaintiff's outlets.

■ Both the products look alike. Both products are first dipped in sauce and then eaten. Both party's advertisements talk about "real chicken," and are very similar in presentation. The Defendant's actual product name is "Chicken Breast Tenders," but its advertising leaves out the word "breast" and just stresses "Chicken Tenders." It is also important to point out that although the Defendant denied that it competed with the Plaintiff, the Defendant admitted that the reason it wanted the Plaintiff's television commercials to study was that it was standard practice to obtain the advertisements of their "competitors." In fact, the Defendant itself referred to the Plaintiff as its competitor several different times during the trial. There was therefore enough evidence to allow the jury to find that there was a likelihood of confusion.

*4. HAS PILGRIM'S PRIDE PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT ITS USE OF THE TERM "CHICKEN TENDERS" AND "CHICKEN BREAST TENDERS" IS A FAIR USE?*

■ A fair use is a descriptive use of a name to indicate the nature, quality, and purpose of the goods themselves and not the name of the manufacturer or the distributor of the goods. *Armstrong Cork Company v. World Carpets, Inc.*, 448 F.Supp. 1072, 1078 (N.D.Ga.1978). The jury must consider whether the use of the mark was a fair and good faith use of the term in a descriptive manner in order to find that the Defendant was engaged in a fair use of a protected mark. *Robert B. Vance and Associates, Inc. v. Baronet Corp.*, 487 F.Supp. 790, 797 (N.D.Ga.1979). It is the Defendant's burden to prove that its use was 1) not as a mark, 2) done fairly and in good faith, and 3) only to describe to users its goods. *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir.1980).

Here, the evidence showed that the term "Chicken Tenders" did not describe the product. The product contained other things besides chicken tenderloin, and the tenderloin only represents about 23% of the total product. The ingredient list on the product does not include the word "tenderloin" or "tender." Thus, the jury had sufficient evidence to find that the term "Chicken Tenders" did not describe the product to users.

There was also evidence that the Defendant used the term "Chicken Tenders" as a mark. The term was used denominatively on the Defendant's packages, with a generic description following. This is consistent with a trademark use. The testimony also showed that the Defendant had conducted a trademark search on the term and wanted to trademark the name.

There were a series of memoranda from the Defendant to its advertising agency which proved that the Defendant knew about the Plaintiff's prior use of the term "Chicken Tenders." The evidence showed that the Defendant then decided to switch its focus from "nuggets" to "tenders," and subsequently produced advertising and packaging strikingly similar to the Plaintiff's. Testimony revealed that the shift in focus was at least partially due to the success of the Plaintiff's product.

The jury finding that the Defendant's use of the term was not a fair use must be upheld. There was sufficient evidence to support this finding.

### 5. HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT PILGRIM'S PRIDE'S USE OF THE TERM "CHICKEN TENDERS" AND "CHICKEN BREAST TENDERS" WILLFULLY INFRINGED THE RIGHTS OF BURGER KING?

In a trademark infringement case, the defendant's impermissible animus to benefit from another's mark can be determinative of his incurring liability. *Bonaventure Associates v. Flyer Publishing Corporation,* 621 F.Supp. 107, 110 (S.D.Fla. 1985). The Defendant must either intend to benefit from, or actually benefit from, the use of the plaintiff's mark in an impermissible way. *Id.* The issue of intent is an issue for the finder of fact. *Pullman Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

Here, the Defendant asserts that there is no evidence to support a finding of willfulness. It argues that fingerpointing and accusations are not probative evidence of intent to commit a wrongful act and that there was no evidence to support a finding of intentional acts. Therefore, there can be no finding of willfulness.

■ As discussed previously, there was much evidence regarding the Defendant's knowledge of the Plaintiff's prior use of the term "Chicken Tenders," and regarding the similarity of the advertising and packaging of the Defendant's product. The jury could reasonably conclude that the Defendant was intentionally copying the Plaintiff's product in an attempt to ride the Plaintiff's coattails. Thus, the jury finding that the Defendant willfully infringed on the rights of the Plaintiff must also be upheld.

### 6. HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT PILGRIM'S PRIDE'S USE OF THE TERM "CHICKEN TENDERS" AND "CHICKEN BREAST TENDERS" IS LIKELY TO DILUTE BURGER KING'S MARK UNDER FLORIDA LAW?

■ The Defendant argues that the term "Chicken Tenders" was already used extensively by third parties prior to or simultaneously with the Plaintiff's first use. Additionally, there can be no likelihood of dilution of the term "Chicken Tenders" alone because it is not used alone, but instead was only used as part of the composite mark.

Again, the composite mark argument has been disposed of. The only argument left is that the third party use precludes any dilution by the Defendant.

Dilution requires some proof that the use of the trademark decreases its commercial value. *Freedom Savings and Loan Association v. Way, Jr.,* 757 F.2d 1176, 1186 (11th Cir.1985). If the plaintiff holds a distinctive trademark, it is enough that the defendant has made significant use of a very similar mark. *Id.* On the other hand, if the mark is a weak one, it lacks distinctiveness and the mere use of a similar mark will not establish loss of commercial value. *Id.*

Here, although there was evidence of third party use, most of the third party use was within the chicken industry itself, and thus not in the same market, or in restaurants where the mark was not placed on the goods or containers, and thus could not be considered a use of the mark. Additionally, almost all, if not all, of the third party use included extra words: breast tenders,

chicken tenderloins, natural breast tenderloins, etc. The Plaintiff's term "Chicken Tenders" could therefore be considered a strong mark. The evidence showed that the Defendant's use of the term was significant. This evidence is sufficient to support the jury finding that the Defendant's use of the Plaintiff's mark is likely to dilute that mark.

### 7. HAS BURGER KING PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT PILGRIM'S PRIDE HAS COMMITTED UNFAIR COMPETITION?

To prevail on an unfair competition claim, the Plaintiff must show that there is both secondary meaning and a likelihood of public confusion. *Levi Strauss & Company v. Blue Bell, Inc.,* 778 F.2d 1352, 1362 (9th Cir.1985). Here, the Defendant asserts that there can be no finding of unfair competition because there is no likelihood of confusion and no evidence of secondary meaning. As discussed previously, there was sufficient credible evidence to support a jury finding of both secondary meaning and likelihood of confusion. Additionally, the expert witness testified that in his opinion the Defendant's use of television commercials that were substantially similar to the Plaintiff's was unfair competition. Therefore, the jury finding that the Defendant committed unfair competition was supported by the evidence.

### E. CONCLUSION

The previous review of all the evidence in the light most favorable to the Plaintiff reveals that there was sufficient credible evidence to support each of the jury's findings. The Motion for Judgment Notwithstanding the Evidence must therefore be denied. Accordingly, it is hereby,

ORDERED AND ADJUDGED that the Motion for Judgment Notwithstanding the Verdict is DENIED.

DONE AND ORDERED.