SALSBURY LABORATORIES, INC., Plaintiff,

v.

MERIEUX LABORATORIES, INC., et al., Defendants.

Civ. No. 87–56–ATH(DF).

United States District Court, M.D. Georgia, Athens Division.

April 5, 1989.

On Motion for Reconsideration June 26, 1989.

---

Peter D. Murray and John P. White, Cooper, Dunham, Griffin & Moran, New York City, and Gary B. Blasingame and Andrew J. Hill, III, Athens, Ga., for plaintiff Salsbury Laboratories, Inc.

Kenneth L. Millwood and Joyce B. Klemmer, Smith, Gambrell and Russell, Atlanta, Ga., for defendant Merieux Laboratories, Inc.

FITZPATRICK, District Judge.

Plaintiff Salsbury Laboratories, Inc. (Salsbury) brought the above-referenced diversity action against Defendants Merieux Laboratories, Inc. (Merieux), Donald Hildebrand, and Jack Berg alleging misappropriation of trade secrets (Count One), breach of contract (Count Two), interference with contract (Count Three), and unfair competition (Count Four). Salsbury is seeking permanent injunctive relief, monetary damages, and costs and attorney's fees. The case was tried before the court sitting without a jury in October of 1987. Following a brief explanation of the history of this litigation, the court will enter its findings of fact and conclusions of law in this matter.*

## I. HISTORY OF THE CASE

Salsbury brought this action in July of 1987 alleging that two of its former employees, Defendants Hildebrand and Berg, had misappropriated certain trade secrets of Salsbury and had breached the Patent Assignment and Trade Secrecy Agreements they had signed during their employment with Salsbury. Specifically, Salsbury

---

\* Editor's Note: This opinion has been edited for publication by the Court to preserve the parties' trade secrets. Double brackets ( [[ ]] ) have been inserted to indicate an omission.

alleged that Hildebrand and Berg used Salsbury's confidential and trade secret information to produce a chicken vaccine for Merieux that was almost identical to a vaccine these men had helped develop while they were employees at Salsbury. The court held a hearing on Salsbury's motion for preliminary injunction on August 6–8, 1987. On August 26, 1987, the court issued an Order finding that Salsbury had established a substantial likelihood of prevailing on the merits at trial, but had failed to establish that it would suffer irreparable harm before trial in the absence of a preliminary injunction. [[ ]] Based on these findings, the court denied Salsbury's motion. [[ ]]

The non-jury trial was held on October 1–9, 1987. At the conclusion of the trial, Defendants moved to dismiss those counts of the Complaint alleging breach of contract and interference with contract. Defendants argued that the Patent Assignment and Trade Secrecy Agreements on which these counts were based were invalid and unenforceable under the constitutional, statutory, and common law of Georgia. In an Order dated March 26, 1988, this court found that Iowa law was controlling in determining the validity of these Agreements. The court further found that the Agreements were valid and enforceable under the substantive law of Iowa. [[ ]] Based on these findings, the court denied Defendants' motion to dismiss the contract claims.

After receiving the court's ruling on the contract issue, the parties submitted proposed findings of fact and conclusions of law on all claims asserted in Salsbury's Complaint. The court has carefully considered the parties' submissions and the relevant case law, and issues its ruling as follows.

## II. FINDINGS OF FACT

### A. *The Parties*

1. Salsbury is a leading developer and producer of veterinary products in the United States. Salsbury maintains its headquarters and primary research and development facilities in Charles City, Iowa.

2. Merieux is a small research and development laboratory which maintains its headquarters in Athens, Georgia. Merieux was set up as a wholly-owned subsidiary of Rhone–Merieux Laboratories of Lyon, France, an international developer and producer of veterinary products. [[ ]]

3. Merieux competes with Salsbury in the production and sale of animal products, including animal vaccines. [[ ]]

4. Defendant Hildebrand is a former employee of Salsbury. In 1966, Hildebrand began working as a Biologics Production Technician for Fromm Laboratories, Inc., a subsidiary of Salsbury. In 1973, Salsbury transferred Hildebrand to its headquarters in Charles City, and promoted him to Biologics Production Manager. In 1982, Salsbury promoted Hildebrand to the position of Director of Biological Operations, a position he held until November 2, 1984.

5. While at Salsbury, Hildebrand was involved in the development and licensing of numerous veterinary products and vaccines, including MG–BAC, the vaccine that is the focus of this litigation. Hildebrand directed the entire research and development effort concerning MG–BAC, and all personnel involved in this effort reported directly or indirectly to him. [[ ]]

6. In addition to his involvement with MG–BAC, Hildebrand worked on the development and improvement of a formulation used in freeze-drying live organisms. Salsbury denominated this formulation Stabilizer H (SBH). SBH is used in the production of animal vaccines to store and maintain the seed stock from which the vaccines are produced. [[ ]]

7. During Hildebrand's term of employment, Salsbury obtained approval from the United States Department of Agriculture (USDA) for the use and development of SBH and MG–BAC.

8. Hildebrand had direct access to Salsbury's trade secret and confidential information relating to SBH and MG–BAC. He was a key employee at Salsbury and was relied upon to protect and maintain the secrecy of Salsbury's confidential and trade secret information. [[ ]]

9. On November 1, 1984, Hildebrand gave written notice that he was resigning from Salsbury and accepting a position as General Manager with Merieux. Because of his position with Salsbury and his access to trade secret and confidential information, Hildebrand was requested to leave Salsbury the same day he tendered his notice of resignation. Hildebrand began working for Merieux two weeks after he left Salsbury.

10. When Hildebrand left Salsbury, he took some documents with him, including certain documents relating to Salsbury's MG–BAC and SBH. [[ ]]

11. Defendant Berg is also a former employee of Salsbury. Berg joined Salsbury as the Biologics Production Supervisor in November of 1976. On January 2, 1983, Berg moved to Salsbury's subsidiary, Fromm Laboratories, to become the Biologics Production Supervisor. In both of these positions, Berg reported directly to Hildebrand. [[ ]]

12. Like Hildebrand, Berg was involved in the initial development of Salsbury's MG–BAC. Berg had supervisory responsibility for the production of MG–BAC under Hildebrand. [[ ]]

13. As a supervisory employee at Salsbury, Berg was relied upon to protect and maintain the secrecy of Salsbury's confidential and trade secret information. [[ ]]

14. In the fall of 1985, Hildebrand recruited Berg to accept a position at Merieux. Hildebrand contacted Berg while he was working for Salsbury and met with Berg twice to persuade him to become the Operations Manager at Merieux. Hildebrand knew of Berg's experience with the development and production of Salsbury's MG–BAC, and he testified that he hired Berg to help develop Merieux' MG bacterin vaccine on an industrial scale. [[ ]]

15. On January 3, 1986, Berg resigned from Salsbury and joined Merieux as Operations Manager.

16. During their terms of employment with Salsbury, both Hildebrand and Berg signed identical Patent Assignment and Trade Secrecy Agreements that prohibited them from disclosing Salsbury's trade secret or confidential information at any time during or after their periods of employment with Salsbury. [[ ]]

### B. Salsbury's Development of MG–BAC

17. *Mycoplasma gallisepticum* (MG) is a bacterium that causes a respiratory disease in chickens, turkeys, and other avian species. MG infections in chickens result in lowered egg-producing ability, fewer and smaller eggs, chickens of reduced quality, and reduced feed utilization. [[ ]]

18. A bacterin is a vaccine that is made from a killed bacterium or virus. A bacterin fights the disease caused by the live bacterium or virus by causing the body to produce antibodies. [[ ]]

19. In 1979, Salsbury was asked to produce an autogenous MG vaccine for a single flock of infected chickens in Texas. An autogenous vaccine is made from an inactivated organism that has been isolated from a specific flock of infected birds. In producing this autogenous vaccine, Salsbury combined its own trade secret information with information then available in the public domain. [[ ]]

20. After the autogenous vaccine proved successful in treating the infected flock, Salsbury decided to conduct research and tests in an attempt to produce an MG bacterin vaccine that could be sold on the commercial market. [[ ]]

21. As Biologics Production Manager, one of Hildebrand's responsibilities at Salsbury was to oversee the production of autogenous vaccines. Both Hildebrand and Berg did an extensive amount of work in developing the autogenous MG vaccine for the single flock in Texas, and in developing Salsbury's commercial MG vaccine.

22. Before an animal vaccine may be produced and sold commercially in the United States, the producer is required to obtain a license of approval from the United States Department of Agriculture (USDA). To obtain this license, the producer must submit an application, including a production outline, to the USDA. The production outline is a detailed step-by-step analysis of the method used to produce the

vaccine. The outline includes, among other things, an explanation of testing procedures and chemical dosages utilized in making the vaccine. Once production of the vaccine has been approved, the USDA requires the producer to follow the steps of the production process set forth in the production outline, unless amendments to the outline are later approved by the USDA. [[ ]][1]

23. On March 5, 1981, Salsbury submitted to the USDA a production outline for its MG vaccine along with an application for a license to produce and market the vaccine. The production outline for Salsbury's commercial MG vaccine contained a detailed description of the complete process used in developing the vaccine.

24. Eleven months later, after all testing of the vaccine had been completed, the USDA issued a license to Salsbury authorizing the production and sale of the MG vaccine. Thereafter, on May 25, 1982, Salsbury introduced its MG vaccine into the marketplace under the name MG–BAC.

25. Salsbury was the first company to produce an MG bacterin vaccine to be sold commercially in the United States. Salsbury's process for producing MG–BAC had never been used prior to its development by Salsbury. Although certain steps of Salsbury's process had been used to produce other vaccines, the steps had not, prior to Salsbury doing so, been combined in the same manner as in the MG–BAC process. Consequently, while certain of the individual steps were known to be used in producing vaccines, Salsbury's process as a whole had never before been followed in producing a commercially-available MG bacterin vaccine in the United States. [[ ]]

26. After receiving the license to produce MG–BAC, Salsbury continued to conduct a significant amount of research and a number of tests which resulted in many improvements in the production process. In an effort to implement these improve-ments, Salsbury sought and obtained approval from the USDA for several amendments to its original production outline. Significant improvements were made to the MG–BAC vaccine up to November of 1984 when Hildebrand left Salsbury. [[ ]]

27. Salsbury was the sole marketer of a USDA-licensed inactivated MG vaccine from 1982 until April of 1987, when Merieux entered the United States market with a competing vaccine. During the time Salsbury enjoyed its exclusive market position in connection with MG–BAC, it had sales in excess of $6.5 million of the product in the United States and $10.0 million worldwide. [[ ]]

28. Although one of the Defendants' expert witnesses testified that a number of companies could have produced an inactivated MG vaccine from information available in the scientific literature, no other company, with the exception of Merieux, attempted to compete with Salsbury's MG–BAC until Schering–Plough introduced an inactivated MG vaccine on the market in June of 1987, more than five years after Salsbury first introduced MG–BAC. [[ ]]

### C. *Merieux' Development of GALLI-MUNE*

29. At the time Hildebrand was contacted about becoming the General Manager at Merieux, he wrote a letter to Dr. Daniel Gaudry, Vice President of Merieux, in which he emphasized his key role in the development of Salsbury's MG–BAC. Prior to employing Hildebrand, Merieux had done no work on developing an inactivated MG vaccine. Shortly after Hildebrand joined Merieux, he proposed that one of the first products Merieux develop be an inactivated MG vaccine. [[ ]]

30. Hildebrand instructed a young researcher at Merieux, Keith Garrett, to begin work on a MG vaccine under Hildebrand's supervision. At the time Hilde-

---

1. In the early 1980s, the USDA implemented the Freedom of Information Act (FOIA) and began allowing public access to any information in production outlines that was not considered trade secret or confidential information by the producer. Consequently, in 1982, Salsbury be-gan designating much of the information in its production outlines "Confidential," and the majority of the text of the MG–BAC production outline was so designated. Prior to implementing the FOIA, the USDA did not permit public access to production outlines.

brand began supervising work on the vaccine, he obtained the [[ ]] organism, or strain, from [[ ]] and provided this strain to Garrett. [[ ]] In addition to providing Garrett with the [[ ]] Hildebrand gave Garrett a document which contained the formula for the medium used by Salsbury in its MG–BAC production process. The formula for the medium is like a recipe in that it lists ingredients and the specific amounts of each ingredient used to grow the MG organism.

31. Garrett began his work on Merieux' inactivated MG vaccine in February of 1985. Garrett performed various experiments on the vaccine through May of 1985. In May, Garrett performed challenge tests on three experimental MG vaccines. Although Defendants contend the challenge tests were successful, none of these experimental vaccines was submitted to the USDA for approval.

32. In September of 1985, shortly before Berg joined Merieux, Hildebrand provided Garrett with a copy of the MG–BAC production outline Hildebrand had taken from Salsbury. Before giving this production outline to Garrett, Hildebrand redacted all references to Salsbury. At some point either before or after he gave Garrett a copy of the production outline, Hildebrand destroyed the original copy he had taken from Salsbury. [[ ]]

33. On February 4, 1986, at Hildebrand's direction, Garrett sent a copy of the redacted Salsbury production outline to Merieux' parent company in Lyon, France, to demonstrate the progress Merieux was making with its MG bacterin vaccine. In addition to the production outline, Garrett provided Merieux' parent company with the formula for SBH.

34. After Berg joined Merieux, he was given a copy of the redacted production outline. Berg adapted this production outline so that it could be submitted to the USDA along with Merieux' application for a license to produce an inactivated MG vaccine. Berg was aware that the redacted production outline he had been given was a copy of Salsbury's MG–BAC production outline. On June 9, 1986, Merieux submitted to the USDA the revised production outline and an application for license. The production outline submitted by Merieux was almost a verbatim copy of Salsbury's MG–BAC production outline as it existed in November of 1984 when Hildebrand left Salsbury. [[ ]]

35. Merieux considers the process it uses in developing its MG vaccine to be confidential. In the production outline it submitted to the USDA, Merieux claimed that the data, techniques, and methodology used in producing its own MG vaccine are to be considered the "Confidential" information of Merieux. [[ ]]

36. On March 13, 1987, the USDA approved Merieux' application and issued Merieux a license to produce an inactivated MG vaccine. Immediately after Merieux received USDA approval, it began selling its MG vaccine on the commercial market under the trademark GALLIMUNE. [[ ]]

37. After Merieux received its license for the GALLIMUNE vaccine, it sent its parent company a collection of documents entitled "Product Registration Information." These documents were to be used by the parent company in submitting an application to the French Government for a license to market the GALLIMUNE vaccine in France. Although the parent company has had prior experience with MG vaccines, it has never produced a commercially-available inactivated MG vaccine. Shortly after receiving the "Product Registration Information," the parent company filed an application with the French Government asking for approval to market the GALLIMUNE vaccine. [[ ]]

38. Although Merieux initially used Salsbury's medium to produce its GALLIMUNE vaccine, after it submitted the application to the USDA, it began research to develop a new medium for GALLIMUNE. Merieux employed Dr. Ta Hsu to develop the new medium. Dr. Ta Hsu conducted various experiments and eventually developed a new medium which Merieux has been using since June of 1987.

39. Merieux gained a significant advantage in the marketplace by relying on Salsbury's production process to produce GAL-

LIMUNE. Merieux was able to save a great deal of time and money by using Salsbury's MG–BAC process as a model for the development and production of GALLI-MUNE. [[ ]]

### D. *Salsbury's Trade Secret and Confidential Information*

40. Salsbury contends that the overall process it uses in making MG–BAC, as well as the fact that it uses certain steps in the process, constitutes the trade secret and confidential information of Salsbury. Defendants contend that the information Salsbury used in developing MG–BAC was well-documented in scientific literature, and therefore, it does not constitute the trade secret and confidential information of Salsbury.

### (1) The Organism

41. The starting point in developing a vaccine is to identify the specific isolate, or strain, of the virus that is to serve as the antigen in the vaccine. Salsbury used the [[ ]] strain in MG–BAC.

42. [[ ]]

43. While at Salsbury, both Hildebrand and Berg worked with the [[ ]] strain in developing MG–BAC. When Hildebrand began work on an MG vaccine at Merieux, he obtained the [[ ]] strain from [[ ]] and suggested to Garrett that he use the [[ ]] strain in developing Merieux' MG vaccine. Although other strains are available for use in an MG vaccine, and although Merieux' parent company has used the [[ ]] and [[ ]] strains in producing MG products, Merieux used the strain in producing GALLI-MUNE. [[ ]]

44. Salsbury uses [[ ]] test to identify the MG organism at the beginning of the production process:

[[ ]] Although these tests can be found in scientific literature, it is not publicly known that Salsbury uses these [[ ]] specific identification tests in producing MG–BAC. [[ ]]

45. Both Hildebrand and Berg were aware that Salsbury uses these [[ ]] identification tests in connection with MG–BAC. While other identification tests can be used

in the development of an MG vaccine, Merieux uses these [[ ]] tests in its production of GALLIMUNE. Merieux also uses a [[ ]] identification test not used by Salsbury.

### (2) The Medium

46. After the specific organism is identified, the producer of a vaccine must develop an appropriate medium within which to grow the organism. The producer must select the specific ingredients and determine the specific amounts of each ingredient to be used in growing the organism in sufficient quantity and quality so that it can be used in a commercial vaccine. [[ ]] Salsbury used a modification of a proprietary medium which it had developed earlier and used for its [[ ]] diagnostic product. After this medium proved successful [[ ]] Salsbury conducted research to modify and improve the [[ ]] medium for use in the commercial production of MG–BAC. [[ ]] 87.

47. Salsbury made two significant improvements to its medium between 1982 and 1984; (1) elimination of two ingredients, [[ ]] that were unnecessary to the growth of the MG organism; and (2) use of [[ ]] in the medium rather than [[ ]]. The elimination of [[ ]] resulted in a $100,000.00 per year savings to Salsbury. By 1984, Salsbury had developed a unique, cost-efficient medium for its MG–BAC production process. [[ ]]

48. Although various media in the public domain contain ingredients that are contained in Salsbury's medium, there is no medium in the public domain that contains the identical ingredients in the identical quantities. [[ ]]

49. Both Hildebrand and Berg were aware of the medium Salsbury was using to produce MG–BAC. When Hildebrand began work on an MG vaccine at Merieux, he gave Garrett a document showing the exact formulation of Salsbury's medium and told Garrett to order the ingredients listed in the document. Although the testimony at trial indicated that the MG organism would grow in numerous media, Merieux originally used substantially the same

ingredients Salsbury used in its medium, in the same amounts. [[ ]]

50. Defendants produced several witnesses at trial to establish that "it has been well known" for at least twenty years [[ ]]. Although Defendants attempted to establish that this fact was common knowledge in the vaccine industry, Salsbury, one of the leading developers of vaccines in the United States, did not discover this fact until more than two years *after* it began producing an MG vaccine. Moreover, even though it was supposed to be common knowledge that [[ ]] were not needed in growing an MG organism, both Hildebrand and Berg used [[ ]] in their work with the MG–BAC medium at Salsbury. Merieux' parent company also used [[ ]] in its MG products. [[ ]]

51. In addition to the formula for the medium, Salsbury cited [[ ]] processes which it considers to be unique to the MG–BAC medium: [[ ]] to adjust the·pH of the medium [[ ]].

52. Merieux utilizes the [[ ]] processes mentioned in paragraph 51 above in preparing its medium for GALLIMUNE. Although certain defense witnesses testified at trial that it is common knowledge that [[ ]].

(3) Growth Conditions

53. After the producer identifies the specific organism and develops the appropriate medium, he then must determine what conditions will allow optimal growth of the organism. Salsbury claims that several of the growth conditions it uses in producing MG–BAC constitute the trade secret and confidential information of Salsbury.

54. First, Salsbury adds [[ ]] to inactivate, or kill, the organism. The addition of [[ ]] at this rate is only one of several methods that can be used to inactivate an organism. [[ ]]

**2.** Salsbury also claimed that two other growth conditions it uses constitute trade secret and confidential information:

[[ ]] The evidence showed, however, that Merieux' production outline does not require [[ ]].

55. Both Hildebrand and Berg were familiar with Salsbury's method for inactivating the MG organism. Although other methods of inactivating an organism were available, Merieux chose to inactivate its MG organism by adding [[ ]].

56. Second, Salsbury uses [[ ]] during fermentation to inhibit the growth of organisms other than MG. Salsbury has determined that [[ ]] is preferable to other available inhibitors. [[ ]]

57. Both Hildebrand and Berg knew that Salsbury used [[ ]] as an inhibitor during fermentation. Among the choices available, Merieux decided to use [[ ]] as an inhibitor in its GALLIMUNE product. [[ ]]

58. Third, as part of the growth process, Salsbury automatically controls the pH of the organism in the fermenter at [[ ]].

59. Hildebrand was aware that Salsbury used [[ ]] to automatically control the pH of the organism in the fermenter when producing MG–BAC, and Merieux followed the same steps to control the pH of the MG organism in its fermenter when producing GALLIMUNE. [[ ]]

60. Finally, Salsbury uses [[ ]] as a means of concentrating the organism after it leaves the fermenter. The purpose of [[ ]] is to reduce the liquid portion of the formulation. Salsbury determined that [[ ]] fiber ultrafiltration is the most cost effective method of concentrating organisms for its MG–BAC process. [[ ]]

61. Merieux also uses [[ ]] to concentrate its organisms. After Merieux decided to utilize this method, it contacted Mr. Kopf, an expert in filtration systems, and asked him to design a [[ ]] for Merieux. While both Salsbury and Merieux use [[ ]] [2] Salsbury uses a system designed by Romicon, and Merieux uses the system specially designed by Mr. Kopf. [[ ]]

The evidence also showed that the macroscopic examination process simply means that the microbiologist looks at the culture to see if it is growing and to see whether dead cells are collecting at the bottom of the test tube.

#### (4) Challenge Procedure

62. After the organism has been prepared for use, it must be tested, or challenged, to determine its potency. Salsbury selected the [[ ]] isolate for use in its challenge tests, grew the challenge culture in a carbon dioxide incubator, and adopted a particular scoring test to establish potency. [[ ]]

63. Hildebrand and Berg were familiar with the challenge procedure used by Salsbury in connection with MG–BAC, and while at Salsbury they did extensive work on developing a method to carry out the challenge tests. Like Salsbury, Merieux has selected the [[ ]] isolate for use in its challenge tests, Merieux grows the culture [[ ]][3] and Merieux uses the same scoring test to establish potency as does Salsbury. While Hildebrand and Berg contend that an article they authored during their employment at Salsbury has placed Salsbury's challenge test in the public domain, the court notes that this article describes only the method of *performing* the challenge test and does not describe how the challenge culture is *prepared* in the laboratory. [[ ]]

64. After considering the evidence, the court finds that the specific ingredients and methods referred to in paragraphs 41 through 63 above, as combined by Salsbury in the production of its inactivated MG vaccine, are unique to Salsbury.

#### (5) The MG–BAC Production Process as a Whole

65. In addition to claiming that the individual steps of the MG–BAC process are proprietary, Salsbury also claims that the process as a whole, as reflected in the MG–BAC production outline, constitutes Salsbury's trade secret and confidential information. Two high-level employees of Salsbury testified at trial that Salsbury has always considered the MG–BAC multi-step production process to be a trade secret of the company. [[ ]]

66. Defendants' expert, Dr. Yoder, testified that a trained microbiologist could produce an effective MG bacterin using the methods outlined in his (Dr. Yoder's) publications.[4] Dr. Yoder has produced an MG bacterin on a very limited scale in his own laboratory. Dr. Yoder further testified, however, that the specific ingredients and the specific amounts of the ingredients in Salsbury's medium are different from the ingredients and amounts in the medium he employs in his own research, and that Salsbury's medium cannot be found in the public domain. Dr. Yoder also testified that he was unaware [[ ]]. Finally, Dr. Yoder testified that Salsbury's ability to scale up MG–BAC to a commercial production level was a significant achievement. Although Dr. Yoder's publications provided a starting point for Salsbury when it began developing MG–BAC, both the individual steps and Salsbury's overall production process differ from the steps and method described in Dr. Yoder's articles. [[ ]]

67. Defendants introduced into evidence at trial a production outline that had been prepared by Dr. Kleven.[5] Dr. Kleven has worked closely with Hildebrand on various projects, and he consulted with Merieux personnel on the GALLIMUNE project. He agreed to write a MG bacterin production outline for the Defendants' use at trial. While Dr. Kleven's outline contains some of the same steps found in Salsbury's outline, it differs in many respects. Dr. Kleven used a different medium, and in many of the steps, he simply provided various

---

3. Salsbury also claimed that two other processes it uses in formulating the final vaccine constitute trade secret and confidential information: [[ ]] The evidence showed, however, that Merieux does not have a set procedure of [[ ]] and is routinely done to allow for an accurate antigen measurement.

4. Dr. Yoder has been working with mycoplasma since 1957. He is recognized around the world as an expert in mycoplasma and has written several articles on the subject. He was qualified to testify as an expert on mycoplasma during the preliminary injunction hearing in this case.

5. Dr. Kleven is a professor of avian medicine and medical microbiology at the University of Georgia. He has done extensive work in the area of mycoplasma, and he was qualified to testify as an expert on this subject during the preliminary injunction hearing and the trial of this case.

alternatives that could be followed. Dr. Kleven did not indicate which specific methods or ingredients among the alternatives should be used. [[ ]]

68. Dr. Milward, the individual responsible for the production of all bacterins at Rhone–Merieux, testified that the steps used in Salsbury's MG–BAC production process are also used in the production of certain bacterins at Rhone–Merieux. Although some steps are followed in the production of almost all bacterins, the specific ingredients and methods used in each step of Salsbury's MG–BAC process do not exist in the public domain and are unknown to its competitors. [[ ]]

69. Defendants also relied on the testimony of Mr. Kopf. Mr. Kopf, who was qualified as an expert in the application and design of filtration systems, attempted to provide a narrative outline of the overall production process of an MG bacterin. Mr. Kopf's testimony was very general and did not begin to address the specifics necessary to produce an MG bacterin. The court seriously doubts that Mr. Kopf could in fact produce an inactivated MG vaccine on a commercial scale, or that he could explain to someone else the details necessary to produce such a vaccine.

70. Defendants also introduced into evidence a MG bacterin production outline prepared by Mr. Dale King. At the time of trial, Mr. King was President of Select Laboratories. He is also the former head of the Research Department at Salsbury. Mr. King testified that Salsbury was a competitor of his company, Select Labs, and that Salsbury's success in this action would adversely affect Select Labs.[6] Mr. King is a personal friend of Hildebrand, and he agreed to write a production outline especially for use at trial after talking to and receiving certain materials from Hildebrand. Both Mr. King's social relationship with Hildebrand and his position as a competitor of Salsbury cast some doubt on the trustworthiness of his testimony. Moreover, almost every witness who testified at

trial on the subject stated that Salsbury's medium does not exist in the public domain. Yet in his outline, Mr. King produced a medium almost identical to the one used by Salsbury. It is highly unlikely that Mr. King could have formulated a medium that mirrors Salsbury's medium solely from information he obtained through the literature given to him. Since Mr. King has never before developed an inactivated MG bacterin, the court is of the opinion that Mr. King received information directly from Hildebrand to help him develop the medium in his outline. Consequently, the validity of Mr. King's entire production outline is in doubt. [[ ]]

71. After considering all the evidence in this case, the court finds that the multi-step production process used by Salsbury in its development of MG–BAC does not exist as a whole anywhere in the public domain. [[ ]]

#### (6) Stabilizer H

72. The final trade secret that Salsbury claims was misappropriated by the Defendants is Salsbury's formulation for SBH. As noted above, SBH is used in freeze-drying live organisms while they are being stored. *See* ¶ 6, *supra.* Salsbury uses SBH in many of its live virus products, but not in the development of MG–BAC. [[ ]]

73. Hildebrand worked on the SBH formulation while he was employed at Salsbury. When he left Salsbury, Hildebrand took with him a document showing the SBH formulation. Merieux does not use SBH in its GALLIMUNE product, but it has used SBH in storing master seed stock of MG. [[ ]]

#### E. *The Impact of Competition in the Marketplace*

74. Salsbury spent more than $1.0 million on researching and developing its MG vaccine. This monetary figure represents at least 14 man-years of Salsbury staff

---

**6.** Select Labs has now been purchased by Rhone–Merieux, and Mr. King has been retained in a management position.

time that has been devoted to this effort.[7]
[[ ]]

75. Salsbury began selling MG–BAC in the United States in 1982. Since MG–BAC was the first commercial product of its kind in this country, Salsbury had full responsibility for developing a market for its inactivated MG vaccine. The testimony at trial indicated that Salsbury spent in excess of $2–4 million in advertising and marketing MG–BAC. [[ ]]

76. Salsbury's MG–BAC was the only inactivated MG vaccine being sold in the United States from 1982 to 1987. Two of the Defendants' experts testified that other developers did not produce a vaccine to compete with MG–BAC because (1) the United States' market was limited, and (2) the costs associated with producing a MG vaccine were high, "and the possibility of developing [such a vaccine] and selling it at a profit would be somewhat questionable." Although the United States' market may be limited, inactivated MG vaccines can be sold worldwide. Indeed, Salsbury had developed an international market for MG–BAC. [[ ]]

77. Salsbury's gross domestic sales of MG–BAC totaled $1,174,700.00 in 1983; $1,779,600.00 in 1984; $1,540,000.00 in 1985; and $1,370,000.00 in 1986. Salsbury originally forecasted that its gross domestic sales of MG–BAC in 1987 would be $1,500,000.00. Both Merieux and Schering–Plough entered the market in 1987, however, and Salsbury reduced its original forecast to $1,022,000.00. [[ ]]

78. From 1982 until July of 1987, Salsbury sold MG–BAC at $92.50 per bottle. In April of 1987, Merieux began selling GALLIMUNE at $80.00 per bottle. In June of 1987, Schering–Plough also began selling its inactivated MG vaccine at $80.00 per bottle. After Merieux and Schering–Plough had placed their products on the market, Salsbury lowered the price of MG–BAC to $85.00 per bottle. [[ ]]

79. As of the preliminary injunction hearing in August, Merieux had sold 3,445 bottles of GALLIMUNE. If these bottles

of MG vaccine had been sold by Salsbury at its original price of $92.50 per bottle, Salsbury's gross sales would have been $318,662.50. Since Salsbury's gross profit margin was 65% at the time Merieux entered the market, Salsbury would have earned approximately $207,000.00 in profit if it had sold all those bottles sold by Merieux. An official from Salsbury testified that for all of 1987, Salsbury lost between $300,000.00 and $500,000.00 in sales due to Merieux' entry into the market. [[ ]]

80. As noted in paragraph 78 above, Salsbury was forced to lower the price of MG–BAC by $7.50 per bottle when Merieux and Schering–Plough entered the market. Based on the average number of bottles of MG–BAC Salsbury had sold during the years 1983 through 1987, an official from Salsbury testified that this "price erosion," which was a direct result of other competitors entering the market, would cost Salsbury between $150,000.00 and $300,000.00 per year for every year the MG vaccine was being sold. This official admitted, however, that both Merieux' *and* Schering–Plough's entry into the market contributed equally to Salsbury's decision to lower the price of MG–BAC.

81. The testimony at trial also indicated that a number of Salsbury's own employees have spent several hours in prosecuting this suit. A Salsbury official estimated the "in-house" costs of litigation to be $172,375.00: $152,375.00 representing the cost of their employees' time, and $20,000.00 representing travel expenses.

82. An official from Salsbury also estimated its attorney's fees in prosecuting this action to be $250,000.00. [[ ]]

## III. CONCLUSIONS OF LAW

### A. *Jurisdiction*

1. The court has jurisdiction over the parties and the action pursuant to the diversity statute, 28 U.S.C.A. § 1332(a) (Supp.1988).

2. Venue is proper under 28 U.S.C.A. § 1391(a) (1976).

7. One man-year equals 2,080 hours, or 52 weeks multiplied by 40 hours per week.

**1568**

3. In a diversity action, the court is bound to apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64; 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

■ 4. The *Erie* doctrine extends to choice of law questions. Thus, a federal court sitting in diversity must apply the forum state's conflict of laws rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Gen. Tel. Co. of the Southeast v. Trimm*, 706 F.2d 1117, 1119 (11th Cir. 1983).

B. *Count One: Misappropriation of Trade Secrets*

(1) The Applicable Law

■ 5. For claims sounding in tort, Georgia follows the traditional rule of *lex loci delicti, i.e.*, the place where the injury occurred. Accordingly, in a tort action, Georgia courts will apply the substantive law of the state where the wrong took place. *Baltimore Football Club, Inc. v. Lockheed Corp.*, 525 F.Supp. 1206, 1207–08 (N.D.Ga.1981); *Karimi v. Crowley*, 172 Ga.App. 761, 762, 324 S.E.2d 583, 584 (1984).

■ 6. In a trade secret misappropriation case, the *lex loci delicti* is not the place where the information was learned, but where the tortious act of misappropriation and use of the trade secret occurred. *Connecticut Artcraft Corp. v. Smith*, 574 F.Supp. 626, 629 (D.Conn.1983). Since the Defendants produced their competing MG vaccine in this State, the court will apply the substantive law of Georgia to Salsbury's claim for misappropriation of trade secret and confidential information.

(2) Liability

■ 7. The Georgia Supreme Court has adopted the definition of trade secret as set forth in 43 C.J.S. *Injunctions* § 148:

A trade secret ... is a plan, process, tool, mechanism, or compound, known only to its owner and those of his employees to whom it must be confided in order to apply it to the uses intended.

*Thomas v. Best Mfg. Corp.*, 234 Ga. 787, 789, 218 S.E.2d 68, 71 (1975); *Outside Carpets, Inc. v. Indus. Rug Co.*, 228 Ga. 263, 267, 185 S.E.2d 65, 68 (1971). A trade secret will be protected from disclosure to the owner's competitor even in the absence of a written agreement. *Salsbury II*, 735 F.Supp. 1545, 1549 n. 4 (M.D.Ga.1988); *Rohm and Haas Co., v. AZS Corp.*, Civil Action No. 1:85–cv–4337–RCF, pp. 14–15 (N.D.Ga. Mar. 18, 1988); *Thomas*, 234 Ga. at 789, 218 S.E.2d at 71.

■ 8. To recover under a claim for misappropriation of trade secrets, the plaintiff must show that the defendants adopted and made use of a trade secret which was disclosed by the plaintiff to the defendants in confidence. *Rohm and Haas*, p. 15; *Morton B. Katz & Assoc. v. Arnold*, 175 Ga.App. 278, 280, 333 S.E.2d 115, 117 (1985); *Wilson v. Barton & Ludwig, Inc.*, 163 Ga.App. 721, 723, 296 S.E.2d 74, 77 (1982).

■ 9. The burden of proof is on the plaintiff to establish that a trade secret exists and that it is not known in the industry. *Eaton Corp. v. Appliance Valves Corp.*, 526 F.Supp. 1172, 1179 (N.D.Ind. 1981).

■ 10. Under Georgia law, concreteness, *Wilson*, 163 Ga.App. at 723, 296 S.E.2d at 77, secrecy, *Water Serv., Inc. v. Tesco Chem. Inc.*, 410 F.2d 163, 172 (5th Cir.1969), and value, *Vendo Co. v. Long*, 213 Ga. 774, 777, 102 S.E.2d 173, 175 (1958), are determinative in deciding whether a trade secret exists.

■ 11. Although a trade secret does not require the uniqueness or novelty of a patent, "it must possess at least that modicum of originality which will separate it from everyday knowledge." *Cataphote Corp. v. Hudson*, 444 F.2d 1313, 1315 (5th Cir.1971); *Salsbury I*, 735 F.Supp. 1537, 1542 (M.D.Ga.1987).

[10] 12. A process used in manufacturing or developing a product may rise to the level of a trade secret, even if similar products are on the market, as long as the precise method used in the process is not

known in the industry. *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 503–04 (5th Cir.1982); *Thomas*, 234 Ga. at 789, 218 S.E.2d at 71.

█ 13. A unique process which is not known in the industry "can be a trade secret even if all of its component steps are commonly known." *Rohm and Haas*, p. 20. In other words, "a trade secret process may be established even if known components are assembled and known techniques are combined to produce a useful process which is not known in the industry." *Id.* at pp. 20–21.

14. The likelihood that a process constitutes a trade secret is increased if the process provides the owner with a substantial competitive advantage in the marketplace. *See Eaton*, 526 F.Supp. at 1180; *Plant Indus., Inc. v. Coleman*, 287 F.Supp. 636, 640 (C.D.Cal.1968).

█ 15. Based on the evidence presented at trial and the relevant case law of this state, the court concludes that the entire multi-step production process used in developing MG–BAC constitutes a trade secret of Salsbury. This process, in its entirety, does not exist in the public domain. At each individual step of the process, there are a variety of alternatives that could be selected for use. Salsbury, through much research and experimentation, chose specific ingredients, specific amounts of each ingredient, specific methods, and specific ways in which to employ each method, at each individual step in the MG–BAC production process. The combination arrived at by Salsbury has resulted in a unique production process unknown to Salsbury's competitors or to anyone in the vaccine industry.

16. In finding that the MG–BAC process as a whole constitutes Salsbury's trade secret information, the court has been persuaded by the fact that Salsbury was the only developer with an inactivated MG vaccine on the market until Merieux began selling GALLIMUNE in 1987. Salsbury introduced MG–BAC in 1982 and enjoyed exclusivity in the marketplace for approximately five years. Merieux had not begun any work on producing an MG

bacterin until Hildebrand became General Manager. Soon after Merieux hired Hildebrand and Berg, both of whom had played key roles in the development of Salsbury's MG–BAC, Merieux introduced an inactivated MG vaccine that substantially mirrored Salsbury's MG–BAC. Merieux was able to produce its competing vaccine by relying on the multi-step process used by Salsbury in producing MG–BAC.

█ 17. In addition to the overall production process, the court finds that the fact Salsbury uses certain ingredients and methods during each step of its process constitutes trade secret information. Specifically, the court concludes that the fact Salsbury uses the following ingredients and methods, which were used initially by Salsbury and then duplicated by Merieux, constitutes the trade secret information of Salsbury: (1) use of the [[ ]] strain; (2) Salsbury's unique medium; (3) use of [[ ]] to inactivate the organism; (4) use of [[ ]] as an inhibitor; (5) use of [[ ]] to adjust and control the pH of the organism; (6) use of [[ ]] to concentrate the organism; and (7) use of the [[ ]] strain, [[ ]] and a particular potency scoring test during the challenge procedure.

█ 18. This court is well aware that trade secrets cease to be trade secrets when competitors duplicate them by "legitimate, independent research." *Thomas*, 234 Ga. at 789, 218 S.E.2d at 71. In the instant case, however, the court is convinced that the Defendants did not discover the specific ingredients and methods noted in the preceding paragraph through their own independent research. Instead, after listening to the testimony at trial, this court is persuaded that the Defendants learned of these specific ingredients and methods during their work on MG–BAC at Salsbury. They knew these specific ingredients and methods, as applied in the MG–BAC production process, constituted the trade secret information of Salsbury, but nevertheless used this trade secret information to develop and produce GALLIMUNE.

**1570**

19. The court's conclusion concerning the secrecy of Salsbury's individual steps is supported by the fact that for each ingredient and method listed in paragraph 17 above, various alternatives were available for use. The evidence indicated, however, that for many of the steps used, the Defendants did not attempt to research available alternatives, but simply employed the ingredients and methods Salsbury had used in its MG–BAC process. For example, before Salsbury used the [[ ]] strain in MG–BAC, this strain had never before been used in an inactivated MG vaccine sold on the commercial market. When Merieux began developing GALLIMUNE, Hildebrand immediately contacted Dr. Yoder and obtained the [[ ]] strain. Merieux did not consider using any other strain even though others were available and others had been used by Merieux' parent company in the development of other MG products. In addition, the evidence at trial clearly established that Salsbury's medium for growing the organism did not exist in the public domain. Yet Merieux used Salsbury's unique medium in the initial stages of its production process, and Merieux used Salsbury's medium as the basis for the development of a new medium. After considering the evidence, the court concludes that the Defendants, in developing a competing MG vaccine, relied on the specific ingredients and methods used in Salsbury's MG–BAC process, not on independent research.

20. In addition to the overall process and the individual ingredients and methods listed in paragraph 17 above, the court also finds that Salsbury's production outline for MG–BAC and its precise formulation for SBH constitute the trade secret information of Salsbury. Neither the production outline nor the SBH formulation were in the public domain. Moreover, they were unique to Salsbury and thus unknown to Salsbury's competitors. Salsbury disclosed the MG–BAC production outline and the SBH formulation to Hildebrand and Berg in confidence, and these men made use of both the production outline and the SBH formulation in their work at Merieux.

21. When an employee leaves his place of employment, he has the right to take with him all the skills he has acquired, all the knowledge he has obtained, and all the information he has received. The employee, however, does not have the right to take the property of his former employer. *Rohm and Haas*, p. 17; *Textile Rubber & Chem. Co. v. Shook*, 243 Ga. 587, 590, 255 S.E.2d 705, 708 (1979). Both Hildebrand and Berg worked extensively on MG–BAC during their respective periods of employment at Salsbury. These men became familiar with Salsbury's trade secret information in connection with MG–BAC, including the specific ingredients and methods employed during each step as well as the overall production process itself. When Hildebrand and Berg began work on an MG vaccine at Merieux, they did not simply apply their generalized skills and knowledge. Moreover, they did not search out scientific literature to learn how to develop an MG vaccine. Instead, both Hildebrand and Berg employed the trade secret information they had obtained while at Salsbury to develop Merieux' MG bacterin. These men brought more than just their general knowledge, skill, and experience to Merieux. They also brought Salsbury's property.

22. Defendants contend that they did not misappropriate Salsbury's trade secret information since some of the steps in the GALLIMUNE production process differ from the MG–BAC production process, and since certain of these steps represent improvements over the MG–BAC process. This argument is unavailing. One who misappropriates the trade secrets of another is liable if the technology used is substantially derived from the owner's trade secret information. *In re Innovative Constr. Systems, Inc.*, 793 F.2d 875, 887 (7th Cir. 1986); *Rohm and Haas*, p. 21. As noted above, these Defendants substantially derived the GALLIMUNE production process as a whole, and the individual steps, from Salsbury's MG–BAC production process. Therefore, the fact that a very limited number of steps may differ in minor ways does not relieve the Defendants of liability.

23. Based on these findings, and after observing the witnesses at trial and considering all the evidence, the court finds that Merieux, Hildebrand, and Berg misappropriated Salsbury's trade secrets in developing a competing inactivated MG vaccine. Salsbury disclosed its trade secret information concerning MG–BAC to Hildebrand and Berg in confidence. Hildebrand and Berg then adopted and made use of Salsbury's trade secret information for the benefit of themselves and Merieux. Consequently, Defendants are liable to Salsbury on Count One of the Complaint.[8]

### (3) Injury

24. "There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, ... than the issuing of an injunction." *Truly v. Wanzer*, 46 U.S. (5 How.) 141, 142, 12 L.Ed. 88, 88 (1847). Although an injunction will not be granted to one who has an adequate remedy at law, *see Sires v. Luke*, 544 F.Supp. 1155, 1166 (S.D.Ga.1982) and *Lawrence v. Lawrence*, 196 Ga. 204, 205, 26 S.E.2d 283, 286 (1943), injunctive relief may be appropriate to prohibit the disclosure of one's trade secret information. *Thomas*, 234 Ga. at 789, 218 S.E.2d at 71.

25. To recover lost profits, the plaintiff must show that such lost profits are traceable to the defendant. *Marco Publications, Inc. v. Southern Airways, Inc.*, 139 Ga.App. 808, 808, 229 S.E.2d 664, 665 (1976). The plaintiff's lost profits also must be shown with reasonable certainty to be recoverable. *See Summerfield v. DeCinque*, 143 Ga.App. 351, 351, 238 S.E.2d 712, 714 (1977) (discussing future lost profits).

26. Where the trade secret of the owner has not been destroyed through publication, the owner is entitled to recover damages in an amount that represents the benefits, advantages, or profits the defendant has gained by using the owner's trade secret. *Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 538, *reh'g denied*, 505 F.2d 1304 (5th Cir.1974); *Biodynamic Technologies, Inc., v. Chattanooga Corp.*, 658 F.Supp. 266, 270 (S.D.Fla. 1987): *Robert B. Vance & Assocs, Inc. v. Baronet Corp.*, 487 F.Supp. 790, 800 (N.D. Ga.1979). While calculating a measure of damages that represents the benefits, advantages, or profits gained by the defendant may be difficult, mere uncertainty should not preclude the plaintiff's recovery. *Univ. Computing Co.*, 504 F.2d at 539. Where it is necessary, the court should employ "a flexible and imaginative approach to the problem of damages." *Id.* at 538.

27. In certain cases, Georgia law authorizes an award of punitive damages if actual damages have been assessed. *See Faircloth v. Greiner*, 174 Ga.App. 845, 846, 331 S.E.2d 905, 907 (1985). The relevant Georgia statute provides in pertinent part:

> In a tort action in which there are aggravating circumstances, in either the act or the intention, the jury may give additional damages to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff.

O.C.G.A. § 51–12–5(a) (Supp.1988). A plaintiff may recover punitive damages if the evidence shows willful misconduct, malice, fraud, wantonness, oppression, or conscious indifference on the part of the defendant. *Wammock v. Celotex Corp.*, 835 F.2d 818, 821 (11th Cir.1988). In a misappropriation of trade secrets case, punitive damages can be awarded where the acts of the defendant are "calculated," "deliberate," "reprehensible," or committed with

---

8. Even if the court had found that the individual steps of Salsbury's process did not in and of themselves constitute trade secret information, the court's conclusion as to the Defendants' liability on Salsbury's misappropriation of trade secrets' claim would be the same. As noted by this court in paragraphs 15–16 above, Salsbury's multi-step production process as a whole constitutes the trade secret information of Salsbury. The fact that individual steps may be found in the public domain "does not negate the trade secrets status of [the process]." *Rohm and Haas*, p. 20. Moreover, "even if only one [of the owner's] trade secret[s] was disclosed ... it would still constitute an unlawful taking of [the owner's] property." *FMC Corp.*, 677 F.2d at 503.

**1572**

the knowledge that they are unlawful. *Sperry Rand Corp. v. A–T–O, Inc.*, 447 F.2d 1387, 1394–95 (4th Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d 479 (1972); *accord Zoecon Indus. v. American Stockman Tag Co.*, 713 F.2d 1174, 1180 (5th Cir.1983).

■ 28. Georgia statutory law also provides that a court may award attorney's fees if "the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense...." O.C.G.A. § 13–6–11 (Supp.1988). "Bad faith" in this section "refers to the transaction out of which the cause of action arose," and not the defendant's conduct in defending the case. *Cade v. Roberts*, 175 Ga.App. 800, 800, 334 S.E.2d 379, 380 (1985).

■ 29. Salsbury asks this court to permanently enjoin the Defendants from further *using* or *disclosing* any of Salsbury's trade secret or confidential information, in particular, that trade secret and confidential information dealing with MG–BAC and SBH. Salsbury's request for injunctive relief includes two different categories: (1) a request to enjoin the Defendants from disclosing Salsbury's trade secret and confidential information to anyone in the future; and (2) a request to enjoin the production and sale of GALLIMUNE since it was developed through the use of Salsbury's trade secret and confidential information. The court finds that enjoining the further disclosure of Salsbury's trade secret and confidential information is warranted; however, the court will not enjoin the Defendants from developing and producing GALLIMUNE in the future.

30. In support of its conclusion, the court notes that at least one other competitor, Schering–Plough, through its own independent research, developed a vaccine to compete with MG–BAC. The evidence at trial also indicated that other competitors, both in the United States and abroad, are either working on their own inactivated MG vaccines or have the capability to introduce such vaccines into the marketplace. Because of Schering–Plough's entry into the market, Salsbury no longer is the sole producer of a commercially-available MG vaccine. This fact weighs against issuing an injunction that would prohibit Merieux from ever developing or producing a competing vaccine.

31. In addition, even though the Defendants used Salsbury's trade secret and confidential information in producing GALLIMUNE, the court finds that the Defendants are potentially capable of developing a competing product of their own in ways other than through the exact duplication of Salsbury's product. The Defendants could draw on their own resources, as well as those of the parent company, to produce a competing vaccine. Although GALLIMUNE was not produced through legitimate, independent research, Schering–Plough's product is evidence that a competing product can be produced absent the knowledge and use of Salsbury's trade secret and confidential information.

32. The court does find, however, that the Defendants should be permanently enjoined from disclosing any of Salsbury's trade secret or confidential information which is now in the Defendants' possession, or to which the Defendants have access. The court recognizes that it is unlikely the Defendants would disclose such information since the information has been incorporated into the GALLIMUNE production process which the Defendants believe constitutes their own trade secret and confidential information. Nevertheless, this Order will make clear that the Defendants are prohibited from ever disclosing, in any manner, any of Salsbury's trade secret or confidential information.

33. In connection with SBH, the court hereby permanently enjoins the Defendants from disclosing the formulation for SBH to any other party. Moreover, since the evidence indicated that no other company is using SBH, the court will permanently enjoin the Defendants from using SBH in any manner.

34. In addition to a permanent injunction, Salsbury is seeking monetary damages and attorney's fees in the amount of $7,129,375.00 plus interest. Specifically, the damages can be categorized as follows:

i) $207,000.00 in lost profits;

ii) $500,000.00 due to price erosion;

iii) $5,000,000.00 in lost investments, including research, development, advertising and marketing costs;

iv) $1,000,000.00 in punitive damages;

v) $172,375.00 for "in-house" costs of this litigation; and

vi) $250,000.00 in attorney's fees.

The court will address each category of damages below.

35. The testimony at trial established that Merieux sold 3,445 bottles of GALLI-MUNE through August of 1987. The testimony also indicated that if Salsbury had sold the bottles purchased by the customers of Merieux, it would have earned approximately $207,000.00 in profits from those sales. It is reasonable to conclude that if Merieux had not entered the market, Salsbury would have sold over 3,000 more bottles of MG–BAC during 1987. Although Schering–Plough entered the market in June of 1987, it was a newcomer to the market and likely would have had few sales in its first two months. Moreover, the lost profits calculated through August of 1987 do not include the bottles sold by Merieux subsequent to August of 1987. Although it is not possible to calculate lost profits in this case to the exact penny, the court concludes that Salsbury can trace lost profits on at least 3,445 bottles of MG vaccine directly to Merieux with reasonable certainty. Accordingly, the court will award Salsbury $207,000.00 in lost profits.

36. Salsbury contends that it will lose $150,000.00 to $300,000.00 a year as a result of the "price erosion" of its product that occurred when Merieux began selling GALLIMUNE at $80.00 per bottle in April of 1987. In June of 1987, however, Schering–Plough also began selling a competing vaccine at $80.00 per bottle. The presence of two competing products on the market forced Salsbury to lower its price. Schering–Plough's entry into the market at $80.00 per bottle was legitimate. On the other hand, Merieux was able to produce its vaccine at a lower price and gain an early entry into the market because it made use of Salsbury's trade secret and confidential information. This early entry into the market at $80.00 per bottle represented an advantage for Merieux and forced Salsbury to lower its prices sooner than it would have if only Schering–Plough had entered the market in 1987. Consequently, Salsbury should be awarded damages for the injury it suffered as a result of Merieux' early entry into the market.

37. Although "price erosion" is difficult to calculate, mere uncertainty should not preclude an award of damages for Salsbury. *Univ. Computing Co.*, 504 F.2d at 539. Salsbury lowered its price in August of 1987, four months after Merieux introduced GALLIMUNE and two months after Schering–Plough introduced its MG vaccine into the marketplace. The court finds that if Merieux had not entered the market in April, Schering–Plough's entry would not have forced Salsbury to lower its price until December of 1987, six months after the single, new competitor entered the market. Since Salsbury lowered its price in August, Merieux' wrongful entry into the market caused Salsbury to lower its price five months before it otherwise would have. An official from Salsbury testified that Salsbury lost between $150,000.00 and $300,000.00 per year as a result of lowering its price to match the competition. Assuming Salsbury would have lost $250,000.00 per year as a result of its lowered price, the court finds that Merieux' early entry into the market resulted in a loss to Salsbury of approximately $104,165.00 in 1987. Accordingly, the court will award Salsbury $104,165.00 in damages for "price erosion" resulting from Merieux' wrongful early entry into the market.[9]

38. Salsbury also contends that Merieux wrongfully took advantage of the $1 million Salsbury expended in research-

9. The court arrived at this figure by taking the $250,000.00 figure, which represents Salsbury's earnings reduction for an entire year, and dividing it by twelve to come up with an average monthly figure. The court then multiplied the monthly figure by 5, which represents the five-month period during which Salsbury would have sold MG–BAC at $92.50 per bottle had Merieux not entered the market.

ing and developing an MG vaccine, as well as the $2–4 million Salsbury expended in developing a market for an MG vaccine. Salsbury seeks reimbursement in the amount of $5 million. The court agrees that Merieux wrongfully took advantage of the time and money Salsbury had expended in developing and marketing an MG vaccine. The court notes, however, that Salsbury has benefitted and continues to benefit from the time and costs it expended in producing and marketing MG–BAC. Consequently, Merieux should not be required to reimburse Salsbury for the entire $5 million.

39. As in the situation involving an award of damages for "price erosion," an award of damages representing the advantage Merieux wrongfully received in using the benefits of Salsbury's prior research, development, and marketing strategies is somewhat difficult to calculate. This uncertainty, however, should not preclude an award of damages for Salsbury. After thoroughly considering the evidence, the court finds that Salsbury should be reimbursed in the amount of $750,000.00 for the wrongful use of its research and development advances, and in the amount of $250,000.00 for the wrongful use of its advertising and marketing strategies.

40. During the time Hildebrand and Berg were at Salsbury, much research and testing was conducted to improve MG–BAC. The evidence is replete with documents showing the results of testing and experimentation that resulted in significant improvements to the vaccine. One improvement alone, the elimination of [[ ]] from the medium, resulted in a savings of over $100,000.00 per year to Salsbury. Hildebrand and Berg took advantage of this testing and experimentation when they began working on an MG vaccine at Merieux. Moreover, this court is of the opinion that Merieux took advantage of many of the advertising and marketing techniques being used by Salsbury when Merieux prematurely entered the market. Merieux should be required to reimburse Salsbury for the wrongful use of its advertising and marketing strategies. Accordingly, the court awards Salsbury $1 million in dam-

ages as the result of Merieux' wrongful use of Salsbury's research, development, advertising, and marketing efforts.

41. Salsbury also seeks $1,000,000.00 in punitive damages. Punitive damages should be awarded to punish, penalize, or deter a defendant, not as compensation to the plaintiff. O.C.G.A. § 51–12–5.1(c) (Supp.1988). After viewing the witnesses at trial and considering the evidence, the court finds that the Defendants' conduct warrants an award of punitive damages. Specifically, Defendant Hildebrand purposefully took documents from Salsbury which he knew contained Salsbury's trade secret and confidential information. Defendant Hildebrand and Berg then used these documents to produce a vaccine to compete with Salsbury's MG–BAC. Defendant Hildebrand then destroyed at least some of the documents he had taken from Salsbury to conceal the fact that he ever had the documents. The Defendants carried out these acts willfully and maliciously, and with the specific intent to cause harm to their former employer, Salsbury. Based on these conclusions, the court finds it necessary to assess a punitive damage award in the amount of $500,000.00 against these Defendants to penalize them for their conduct and to deter them from engaging in similar conduct in the future.

42. Finally, Salsbury seeks to recover its "in-house" costs of litigating this suit as well as attorney's fees. In this court's opinion, both of these claims fall under O.C.G.A. § 13–6–11, which addresses the recovery of expenses of litigation generally.

43. Salsbury contends that it has expended $172,375.00 in "non-attorney" time in protecting its trade secret information. This figure represents numerous hours that Salsbury's employees have expended in maintaining the secrecy of the MG–BAC process, instead of on researching and developing new products. Under O.C.G.A. § 13–6–11, a plaintiff may recover his costs of litigation if the defendant acted in bad faith in causing the plaintiff's injury.

The court already has found that the Defendants' conduct in this case was of the type that gives rise to an award of punitive damages. Likewise, the court concludes that in misappropriating Salsbury's trade secret information, the Defendants engaged in the type of bad faith conduct that would warrant an award of costs under O.C.G.A. § 13–6–11. At the present time, however, Salsbury has not presented specific documentation that would prove its "in-house" costs for litigating this suit totaled $172,375.00. Accordingly, the court hereby directs Salsbury to submit the appropriate records to this court in support of its claim for "in-house" costs of litigation within 15 days of the date of this Order. Defendants will be given 15 days thereafter to respond to Salsbury's submissions.

44. Salsbury also seeks an award of attorney's fees in the amount of $250,-000.00. For those reasons set forth in the preceding paragraph, the court finds that Salsbury is entitled to recover its attorney's fees under O.C.G.A. § 13–6–11. At the present time, however, the court is not in a position to award attorney's fees since Salsbury has not submitted an itemized statement showing the hours its attorneys expended in bringing this action or the rate its attorneys are requesting. Accordingly, the court hereby directs counsel for Salsbury to submit the appropriate documentation concerning attorney's fees to this court within 15 days of the date of this Order. Defendants will be given 15 days thereafter to respond to Salsbury's submissions.

## C. *Salsbury's Other Claims*

45. Salsbury's claims for breach of contract, interference with contract, and unfair competition all arose out of the identical factual situation addressed under Count One. Since the court has found in Salsbury's favor on its claim for misappropriation of trade secrets, the court sees no

need to address Salsbury's other claims. Salsbury would not be entitled to additional damages under these other claims, and any amount of damages awarded to Salsbury on these other claims would result in a double recovery for Salsbury. The law of this State does not allow a double recovery on separate claims arising out of the same factual situation. *See Beltz v. Atlanta Coach Works Corp.*, 172 Ga.App. 604, 606, 323 S.E.2d 901, 903 (1984); *UIV Corp. v. Oswald*, 139 Ga.App. 697, 699, 229 S.E.2d 512, 514 (1976). Accordingly, the court will forego its discussion of liability on Salsbury's other three claims.[10]

## D. *Merieux' Claim for Rule 11 Sanctions*

46. Defendants have filed a motion for Rule 11 sanctions claiming that in its Proposed Findings of Fact and Conclusions of Law, counsel for Salsbury made a false statement of fact which implied that one of the Defendants' witnesses had committed perjury at trial. The proposed finding of fact in question provides in pertinent part:

> [Mr. King's] apparent bias in testifying as an expert witness in this action is made further suspect by the announcement appearing in the *Athens Daily News/Athens Banner–Herald* of July 17, 1988, ... that Rhone Merieux has purchased Dr. King's Select Labs and that Dr. King will be retained by Merieux as part of Select Labs' management. *No doubt the discussions for the purchase of Select Labs by Rhone Merieux were underway when Dr. King testified at trial.*

Plaintiff's Proposed Findings of Fact ¶ 130 (emphasis added). Defendants argue that since Mr. King testified at trial that Rhone–Merieux had not approached him concerning the purchase of Select Labs at any time before trial, Plaintiff's finding of

10. In its detailed Order of March 26th, this court found that the Patent Assignment and Trade Secrecy Agreements signed by Defendants Hildebrand and Berg were valid and enforceable under Iowa law. [[ ]] In light of the March 26th Order, had the court not found in favor of Salsbury on Count One of its Com-

plaint, the court would have found in favor of Salsbury on its claim for breach of contract. The necessity of making such a finding, however, has been rendered moot by this court's ruling on Salsbury's claim for misappropriation of trade secrets.

fact paragraph 130 alleges indirectly that Mr. King committed perjury on the witness stand. After reviewing the relevant portion of the trial transcript and considering the arguments of the parties, however, the court concludes that paragraph 130 of Salsbury's proposed findings of fact does not violate Rule 11. The proposed finding asserted in paragraph 130 is a logical inference that could be drawn from the trial testimony and the subsequent events concerning Rhone–Merieux' purchase of Select Labs. Salsbury was within the bounds of Rule 11 when it implied that Mr. King's testimony was untrustworthy because of his business relationship with the Defendants. Accordingly, the court hereby DENIES Defendants' motion for Rule 11 sanctions.

## IV. SUMMARY

In conclusion, the court reiterates its finding that Defendants Merieux, Hildebrand, and Berg misappropriated the trade secret and confidential information of Salsbury when they developed and produced their inactivated MG vaccine, GALLIMUNE. Based on this finding, and for the reasons fully set forth in this Order, the court hereby finds in favor of Plaintiff Salsbury on Count One of its Complaint, and hereby issues the following injunctive relief and award of damages:

1) that Defendants be permanently enjoined from disclosing Salsbury's trade secret or confidential information, and that Defendants be required to deliver up for destruction all materials embodying such information;

2) that Defendants be permanently enjoined from using SBH in any manner;

3) that Salsbury be awarded compensatory damages in the amount of $207,000.00 for lost profits;

4) that Salsbury be awarded compensatory damages in the amount of $104,165.00 for "price erosion" due to Merieux' wrongful entry into the MG vaccine market;

5) that Salsbury be awarded compensatory damages in the amount of $1,000,000.00 for lost time and money expend-

ed in researching, developing, marketing, and advertising MG–BAC;

6) that Salsbury be awarded punitive damages in the amount of $500,000.00;

7) that Salsbury be awarded its "in-house" costs of litigating this suit in an amount to be determined by the court after the parties have had the opportunity to submit the appropriate documentation; and

8) that Salsbury be awarded attorney's fees in an amount to be determined by the court after the parties have had the opportunity to submit the appropriate documentation.

The total monetary award to be paid by Defendants to Salsbury, exclusive of interest, costs, and attorney's fees, comes to $1,811,165.00. The court will rule on Salsbury's claims for "in-house" costs of litigation and attorney's fees following receipt of submissions from the parties.

SO ORDERED.

## ON MOTION FOR RECONSIDERATION

On April 5, 1989, this court entered its Findings of Fact and Conclusions of Law in the above-referenced matter. In its Order of April 5th, the court found that Defendants Merieux, Hildebrand, and Berg had misappropriated the trade secret and confidential information of Plaintiff Salsbury in producing a vaccine to treat respiratory diseases in chickens. The court granted injunctive relief and awarded Salsbury $1,811,165.00 in compensatory and punitive damages. The court also found that Salsbury should be awarded its "in-house" costs of litigating this suit as well as attorney's fees. The court, however, deferred ruling on the specific amount until the parties had submitted the appropriate documentation in connection with the "in-house" costs and attorney's fees issues.

Following the entry of the April 5th Order, Defendants filed a Motion for Reconsideration in which they asked the court to modify the damage award. Both parties then submitted their positions on the attorney's fees and "in-house" costs issues. The parties also requested clarification on the scope of the permanent injunctive re-

lief. The court has fully considered the post-trial pleadings of the parties. The instant Order will resolve all of the issues that remain in this lawsuit.

## I. MOTION FOR RECONSIDERATION

In its Order of April 5th, the court awarded the following compensatory damages to Plaintiff Salsbury: (1) $207,000.00 for Salsbury's lost profits; (2) $104,165.00 for "price erosion" resulting from Merieux' wrongful early entry into the MG vaccine market; and (3) $1,000,000.00 for time and money expended in researching, developing, marketing, and advertising Salsbury's product, MG–BAC. The court also assessed punitive damages against Defendants in the amount of $500,000.00. The total amount of damages awarded to Salsbury, exclusive of interest, costs, and attorney's fees, was $1,811,165.00.

Defendants have asked this court to reconsider its award of compensatory damages. Specifically, Defendants argue that the court erred by awarding damages that encompass both the Plaintiff's loss and the Defendants' gain. Defendants contend that the present award constitutes a double recovery. In addition, Defendants have asked this court to reconsider its conclusion that Salsbury is entitled to recover its "in-house" costs of litigation as well as its attorney's fees.

### A. *Compensatory Damages*

■ Defendants take exception to the court's award of compensatory damages which they contend results in "double counting." Defendants argue that the present award represents Salsbury's maximum loss resulting from the Defendants' misappropriation of the trade secret information, as well as the Defendants' gain from using the trade secret information. Defendants contend that the court must award damages based *either* on Salsbury's loss *or* on the Defendants' gain.

In support of their position, Defendants cite *Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974), a case relied on heavily by the court in its Order of April 5th. In particular,

Defendants rely on the following language from *Univ. Computing:*

> In some instances courts have attempted to measure the loss suffered by the plaintiff. While as a conceptual matter this seems to be a proper approach, in most cases the defendant has utilized the secret to his advantage with no obvious effect on the plaintiff.... Largely as a result of this practical dilemma, normally the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has in some way destroyed the value of the secret.... Where the plaintiff retains the use of the secret, as here, and where there has been no effective disclosure of the secret through publication, the total value of the secret to the plaintiff is an inappropriate measure.
>
> \*    \*    \*    \*    \*    \*
>
> The second approach is to measure the value of the secret to the defendant. This is usually the accepted approach where the secret has not been destroyed and where the plaintiff is unable to prove specific injury. In the case before us, then, *the "appropriate measure of damages, ... is not what plaintiff lost, but rather the benefits, profits, or advantages gained by the defendant in the use of the trade secret."* The cases reveal, however, many variations in the way this benefit to the defendant can be measured.

*Id.* at 535–36 (citations and footnotes omitted). *See also Sperry Rand Corp. v. A–T–O, Inc.*, 447 F.2d 1387, 1392–93 (4th Cir. 1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d 479 (1972); *Robert B. Vance & Assocs., Inc. v. Baronet Corp.*, 487 F.Supp. 790, 800 (N.D.Ga.1979).

Salsbury, on the other hand, argues that the court is *not* required to focus either on the plaintiff's loss or the defendant's gain. Salsbury contends that the case law provides a more flexible approach that allows this court to base its award both on Salsbury's lost profits and on the unjust enrichment of the Defendants. In support of its position, Salsbury cites *Telex Corp. v. Int'l Business Mach. Corp.*, 510 F.2d 894 (10th

Cir.1975). In *Telex* the court reviewed in some detail the law of damages in trade secrets cases. In its discussion, the *Telex* court cited a Ninth Circuit opinion, *Clark v. Bunker*, 453 F.2d 1006 (9th Cir.1972), and made the following observation:

> [The *Clark*] court commented that since the unification of law and equity, the proper measure of damages was no longer an "either or" matter, i.e., damages limited to *either* plaintiff's loss, *or* defendant's benefit, and that it could be a combination of both where the circumstances called for such in order to make the plaintiff whole.

*Telex Corp.*, 510 F.2d at 931. The *Telex* court seemed to approve of the "combination" approach adopted in *Clark*. In awarding damages based both on the plaintiff's loss and the unjust enrichment of the defendant, the *Telex* court noted:

> [P]erhaps that is a common thread in all of these cases, i.e., the plaintiff should be made whole, and, at the same time, there should be no double recovery.

*Id.*

A brief comparison of *Univ. Computing* and *Telex* illustrates the confusion that exists in connection with the law of damages in trade secrets cases. This court agrees with the *Telex* court to the extent that the "common thread" in trade secrets cases is that the plaintiff should be made whole. Nevertheless, this court is bound by the approach set forth in *Univ. Computing*.[1] Therefore, while this court must endeavor to see that Salsbury is made whole, it must do so by basing its award of damages either on Salsbury's loss, or on the unjust enrichment received by the Defendants.

In deciding whether to focus on Salsbury's loss or on the Defendants' gain, the court must consider the particular facts and circumstances of this case. As noted by the court in *Univ. Computing*, "every case requires a flexible and imaginative approach to the problem of damages.... [and] 'each case is controlled by its own peculiar facts.'" *Univ. Computing*, 504

F.2d at 538 (citation omitted). The facts of this case established that Defendants Hildebrand and Berg did extensive work on a chicken vaccine while they were employed by Salsbury. This vaccine, known as MG–BAC, was developed and refined so that it could be sold on the commercial market. When Salsbury put MG–BAC on the market, it was the only commercial vaccine of its kind. Salsbury enjoyed this exclusivity in the marketplace for five years.

After MG–BAC had been developed and marketed, Hildebrand left Salsbury and began working for a competitor, Merieux Laboratories. Upon his arrival at Merieux, Hildebrand began supervising work on a chicken vaccine that substantially mirrored MG–BAC. A few months later, Berg joined Hildebrand at Merieux. Together, Hildebrand and Berg directed the development of a MG vaccine that could compete with MG–BAC. Merieux named its competing vaccine GALLIMUNE. Before Hildebrand and Berg arrived, Merieux had done no work on developing a MG vaccine.

Although the Defendants have misappropriated Salsbury's trade secret information, they have not revealed this information to any third persons. Indeed, Merieux considers the process it uses in producing GALLI-MUNE to be the trade secret and confidential information of the company. Thus, the only calculable losses suffered by Salsbury in this case have been its lost profits and the "price erosion" of its product resulting from Merieux' wrongful entry into the market. Therefore, the damages in this case should be measured by "the benefits, profits, or advantages gained by the [Defendants] in the use of the trade secret." *Univ. Computing*, 504 F.2d at 536. Indeed, as noted in *Univ. Computing*, measuring damages by the Defendants' gain is "the accepted approach where the secret has not been destroyed and where the plaintiff is unable to prove specific injury." *Id.*

---

1. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

### (1) Profits

■ In its Order of April 5th, the court awarded Salsbury $207,000.00 in lost profits. This figure represented the profits that Salsbury lost when Merieux sold over 3,000 bottles of GALLIMUNE through August of 1987. Thus, the lost profits awarded in the April 5th Order focused on Salsbury's loss, not the Defendants' gain.

At trial and in the post-trial pleadings, however, Defendants have admitted that they made approximately $52,000.00 in profits on the bottles of vaccine they sold through August of 1987. As noted throughout the Order of April 5th, the Defendants were able to develop their competing product by using the trade secret information Hildebrand and Berg had learned while at Salsbury. Thus, the money Merieux made from the sale of its vaccine represents a benefit, profit, or advantage "gained by the [Defendants] in the use of the trade secret." *Univ. Computing,* 504 F.2d at 536. Therefore, the profits earned by Merieux are an appropriate item of damages to be awarded to Salsbury.

Based on these conclusions, the court hereby vacates that portion of its April 5th Order granting $207,000.00 in lost profits to Salsbury. The court hereby modifies that portion of the Order to award Salsbury $52,000.00 in compensatory damages, which represents the profits gained by Merieux in the sale of its competing vaccine.

### (2) Research, Development, Marketing, and Advertising

At trial, Salsbury argued that Merieux wrongfully took advantage of the $1 million Salsbury expended in researching and developing MG–BAC, as well as the $2–4 million Salsbury expended in developing a market for the MG vaccine. The court agreed that Merieux had wrongfully taken advantage of the time and money Salsbury expended in developing and marketing MG–BAC. The court noted, however, that since Salsbury had benefitted and continued to benefit from the time and costs it expended in producing MG–BAC, Merieux should not be required to reimburse Salsbury for the entire $5 million.

After considering the evidence that had been presented at trial, the court concluded that Salsbury should be awarded $1 million dollars for the advantage obtained by Merieux in using Salsbury's research, development, marketing, and advertising strategies. Specifically, the court awarded Salsbury $750,000.00 for the benefit Merieux had obtained by using Salsbury's research and development advances in connection with MG–BAC, and $250,000.00 for the benefit Merieux had obtained by taking advantage of Salsbury's advertising and marketing strategies.

There is no question in this court's mind that the Defendants gained a significant advantage by using Salsbury's trade secret information to produce a competing MG vaccine. Indeed, the Defendants took advantage of several years worth of research and development. By using Salsbury's trade secret information, the Defendants were able to produce a competing vaccine much sooner than if they had used their own independent research. The Defendants also took advantage of Salsbury's advertising and marketing techniques, and of the fact that Salsbury alone had developed a market for a MG vaccine. The $1 million dollar award compensated Salsbury for those benefits and advantages gained by Merieux in using the trade secret information.

Since the $1 million dollar award associated with research, development, marketing, and advertising represented a gain to the Defendants and not a loss to Salsbury, it was proper, and it will stand.

### (3) Price Erosion

■ When Merieux entered the MG vaccine market in April of 1987, Salsbury was selling MG–BAC at $92.50 per bottle. Merieux began selling its competing vaccine at $80.00 per bottle. In June of 1987, Schering–Plough also entered the MG vaccine market, and started selling its product at $80.00 per bottle. As a result of Merieux and Schering–Plough selling their competing vaccines at a lower price, Sals-

bury was forced to reduce the price of MG–BAC to $85.00 per bottle.

In its April 5th Order, the court noted that Merieux had used Salsbury's trade secret information to produce a competing vaccine and gain an early entry into the MG vaccine market. The court also noted that Merieux' early entry into the market had some impact on Salsbury's decision to reduce the price of MG–BAC. Upon making these two conclusions, the court calculated Salsbury's loss as a result of the "price erosion" to be $104,165.00.

The "price erosion" award represents a loss to Salsbury, not a gain to the Defendants. It could be argued that since Merieux used Salsbury's trade secret information to produce a competing vaccine, it benefited to the extent that it could sell its product for less. The extension of the argument would be that since Merieux was able to produce its product more efficiently, the $80.00 figure represents an advantage to Merieux, and Salsbury should be compensated for that advantage.

The court notes, however, that Salsbury was compensated for the benefit Merieux gained by using the trade secret information under the previous category, research and development. The "price erosion" *resulted* from Merieux' wrongful use of Salsbury's trade secret information. Thus, to award Salsbury for the research and development benefits obtained by Merieux and for the "price erosion" that *resulted* from the use of the information would be to allow a double recovery. Having found that the award of "price erosion" damages represents a loss to Salsbury and not a gain to the Defendants, the court hereby vacates that portion of the Order in which it awarded Salsbury $104,165.00 for "price erosion."

In summary, the court finds that its award of compensatory damages should focus on the benefits, profits, and advantages gained by the Defendants in using Salsbury's trade secret information. Therefore, the court hereby modifies its award of compensatory damages as follows:

(1) $52,000.00 for profits gained by Merieux in selling bottles of its competing vaccine; and

(2) $1,000,000.00 for the advantages gained by Merieux in using the research, development, marketing, and advertising techniques of Salsbury.

## B. *Attorney's Fees and "In House" Costs of Litigation*

Salsbury is seeking to recover its attorney's fees and its "in-house" costs for litigating this suit. In the April 5th Order, this court found that under O.C.G.A. § 13–6–11, Salsbury was entitled to both its attorney's fees and its "in-house" costs of litigation. Defendants have asked the court to reconsider its original position on the attorney's fees and costs issues.

### (1) Attorney's Fees

Salsbury has submitted extensive documentation showing that it expended $562,424.31 in attorney's fees in bringing this action. Defendants do not object to the amount of Salsbury's attorney's fees. Instead, Defendants contend that Salsbury cannot recover its attorney's fees since it did not specifically plead and pray for such relief in its Complaint. In particular, Defendants contend that Salsbury cannot recover since it did not use the words "bad faith" in its prayer for attorney's fees.

The court does not agree with the Defendants' argument. O.C.G.A. § 13–6–11 does not require the words "bad faith" to be included in the prayer for attorney's fees. The statute simply states that attorney's fees may be allowed "where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith ..." The "bad faith" referred to in the statute must have arisen out of the transaction that spawned the lawsuit rather than out of the defendant's conduct in defending the case. *Cade v. Roberts*, 175 Ga.App. 800, 800, 334 S.E.2d 379, 380 (1985). In the instant case, Salsbury asked for attorney's fees in its Complaint, and the Defendants acted in bad faith in causing Salsbury's injury. There-

fore, the requirements of the statute have been met.

The court has reviewed Salsbury's request for attorney's fees and finds the request to be in order and reasonable. Moreover, Defendants have no objection to the amount of Salsbury's request. Therefore, this court hereby awards Salsbury its attorney's fees in the amount of $562,424.31.

### (2) "In–House" Costs of Litigation

In addition to its attorney's fees, Salsbury seeks to recover costs for the time that its non-attorney personnel spent in preparing for this litigation. Salsbury is asking for $192,995.00 in non-attorney personnel time, and $24,679.95 in transportation and other related costs. The total amount being sought for "in-house" costs of litigation is $217,674.95. Defendants contend that O.C.G.A. § 13–6–11 does not contemplate the recovery of these costs.

The relevant portion of O.C.G.A. § 13–6–11 reads as follows:

> The *expenses of litigation* generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, . . . the jury may allow them.

O.C.G.A. § 13–6–11 (Supp.1988). The phrase "expenses of litigation" is not defined in the statute. Thus, unlike many statutes providing for the recovery of attorney's fees and costs, section 13–6–11 does not enumerate what costs are recoverable. Where a statute does not define the items of recoverable costs, the allowance or disallowance of particular costs falls primarily within the discretion of the trial court. 20 Am.Jur., *Costs* § 52.

After considering the arguments of the parties and the relevant case law, this court remains convinced that Salsbury's "in-house" costs are expenses of litigation as contemplated under section 13–6–11. The court notes that section 13–6–11 was specifically enacted to address situations where a defendant has acted in bad faith in causing the plaintiff's injury. The statute does not confine itself to "attorney's fees and costs," but instead, incorporates the broader term, "expenses of litigation." Generally, only plaintiffs may recover under this statute, and such recovery is available only upon a showing that the defendant's bad faith conduct forced the plaintiff into prosecuting the suit. *Ravenwood Church v. Starbright, Inc.*, 168 Ga.App. 870, 872, 310 S.E.2d 582, 584 (1983). The purpose of this statute "is to punish a party that has acted in bad faith," *Ballenger Corp. v. Dresco Mechanical Contractors, Inc.*, 156 Ga.App. 425, 433, 274 S.E.2d 786, 794 (1980), and therefore, it must be construed more broadly than 28 U.S.C. § 1920, the federal statute that allows recovery of costs.

Salsbury was forced to bring the instant action to recover for the misappropriation of its trade secret information. This lawsuit involved detailed scientific and technical information concerning the processes used in developing a MG vaccine. The knowledge contributed by the Salsbury personnel was essential to the successful prosecution of this suit. In fact, without the contributions of Salsbury's staff, both the attorneys and the court would have been left floundering in an unfamiliar world of mycoplasmas.

Although the court finds that Salsbury's "in-house" costs of litigation are recoverable under section 13–6–11, the court agrees with the Defendants that the amount sought by Salsbury is somewhat unreasonable.[2] Salsbury requests that its personnel be compensated at the following hourly rates:

| | | |
|---|---|---|
| (1) | Executive | $217.32 |
| (2) | Director | $144.88 |
| (3) | Department Manager | $ 72.44 |
| (4) | Clerical | $ 26.00 |

The total amount in personnel time that Salsbury is seeking comes to $192,995.00. Salsbury also requests $24,679.95 in travel and other related expenses.

---

**2.** An award for litigation expenses under O.C.G.A. § 13–6–11 must be supported by evidence that the expenses were reasonable. *Eways v.*

*Georgia R.R. Bank,* 806 F.2d 991, 992 (11th Cir.1986).

The court has carefully reviewed the documentation submitted by Salsbury in support of its request for "in-house" costs of litigation. Although the number of hours spent by the personnel in prosecuting this suit appears to be reasonable, this court is of the opinion that the rate requested is inflated. Accordingly, the court will reduce the hourly rates by 50 per cent. After this reduction, the total award for "in-house" personnel time equals $96,497.50. The court also finds that the other travel and communication costs requested by Salsbury are reasonable and are recoverable under section 13–6–11.

For these reasons, the court hereby awards Salsbury its "in-house" costs of litigation in the amount of $121,177.45.

## II. INJUNCTIVE RELIEF

In its Order of April 5th, the court issued the following injunctive relief:

> that Defendants be permanently enjoined from disclosing Salsbury's trade secret or confidential information, and that Defendants be required to deliver up for destruction all materials embodying such information

Order, dated April 5, 1989, 735 F.Supp. at 1576, ¶ 1. The court also found, however, that the Defendants should *not* be permanently enjoined from producing or selling their competing vaccine. *Id.* at 1572, ¶ 29. Salsbury has asked for a clarification of the injunctive relief issued by the court. Both sides have now submitted their positions on the proper limits to be applied to the permanent injunction.

The injunctive relief granted in the April 5th Order was not intended to be broad in scope. The evidence at trial showed that by misappropriating Salsbury's trade secret information, the Defendants were able to gain an early entry into the MG vaccine marketplace. The evidence also showed, however, that Salsbury and Merieux are no longer the only companies with MG vaccines on the market. At least one other company has a MG vaccine on the market, and the evidence showed that other companies are either working on such a vaccine

or have the capability of producing such a vaccine.

Beginning with the preliminary injunction hearing, the court's feeling has been that the proper remedy in this case is an award of monetary damages, not a wide-ranging permanent injunction. That feeling has not changed. The court also felt, however, that the Defendants should not disclose Salsbury's trade secret or confidential information to any third party in the future. In issuing this narrow injunctive relief in the April 5th Order, the court noted that it was unlikely the Defendants would disclose such information since much of the information had been incorporated into Merieux' product, and Merieux considered its own product to be a trade secret.

As noted by Defendants, the Court's April 5th Order enjoins future *disclosure* of the trade secret information, not past *use* of the information. The proper remedy for use of the information was a monetary award. Accordingly, the court awarded Salsbury over $1.5 million for the Defendants' unlawful use of the trade secret information. Moreover, the court noted in its Order that while the Defendants used Salsbury's trade secret information when developing the competing product, the Defendants have since that time made certain changes in their product. The court agrees that to require the Defendants to recreate all of their work and re-take all of the necessary steps to obtain a USDA license would be unduly punitive.

Accordingly, the court hereby clarifies the scope of its injunction as follows:

> Defendants are hereby permanently enjoined from disclosing any of Salsbury's trade secret or confidential information, as specifically identified in this Order, which is now in the Defendants' possession or to which the Defendants have access. This injunction is to apply both in the United States and abroad. Moreover, the Defendants are hereby permanently enjoined from knowingly causing or assisting in the disclosure of such trade secret or confidential information by any third party. Finally, the Defen-

dants are hereby required to deliver up for destruction all materials taken from Salsbury that embody such trade secret or confidential information.[3]

### III. CONCLUSION

The court is as familiar with this difficult and complex case as it has been with any other case it has considered. The court has had the opportunity to view all of the witnesses at the preliminary injunction hearing and at the trial, it has had the opportunity to consider all of the evidence submitted, and it has greatly benefitted from the pre- and post-trial pleadings submitted by counsel for both sides. The court has come to a firm conclusion concerning the roles played by Defendants Hildebrand and Berg in misappropriating Salsbury's trade secret information and using that information to develop a competing product for Merieux. The court is convinced, however, that even though the Defendants have acted in bad faith and engaged in somewhat sinister conduct, the proper remedy is in monetary damages and only a narrowly-drawn permanent injunction.

For these reasons, the court hereby MODIFIES the damage award granted in its Order dated April 5, 1989, and hereby GRANTS the following injunctive relief and award of damages to Salsbury:

1) Defendants are bound by the terms of the permanent injunction fully set forth at page 1582 of this Order;

2) Defendants are permanently enjoined from using Stabilizer H in any manner;

3) Salsbury is awarded compensatory damages in the amount of $52,000.00, which represents the profits earned by the Defendants in selling their competing MG vaccine;

4) Salsbury is awarded compensatory damages in the amount of $1,000,-000.00, which represents the advantages and benefits gained by the Defendants in using Salsbury's trade se-

cret information to develop a competing MG vaccine;

5) Salsbury is awarded punitive damages in the amount of $500,000.00;

6) Salsbury is awarded its "in-house" costs of litigating this suit in the amount of $121,177.45; and

7) Salsbury is awarded its attorney's fees in the amount of $562,424.31.

The total monetary award to be paid by Defendants to Salsbury comes to $2,235,-601.76. This award of damages hereby SUPERSEDES the award given in the court's Order of April 5, 1989, and any item of damages given in the court's previous Order that is inconsistent with the damages given in the instant Order is hereby VACATED.

In closing, the court notes that there has been some question concerning publication of the court's ruling. This court is of the opinion that Salsbury should be allowed to publish the verdict it has received. The purpose of sealing this file was to protect the sensitive trade secret information that can be found throughout the file. Allowing Salsbury to publish information concerning this court's final award will not frustrate the purpose of the seal. Moreover, although Salsbury will be allowed to publish limited information concerning this case, Salsbury and Defendants Merieux, Hildebrand, and Berg remain bound by those orders protecting the trade secret information of both parties.

There being no issues left for resolution by this court, the Clerk of Court is hereby DIRECTED to enter a final judgment in accordance with this Order and the Court's Order entered in this matter on April 5, 1989.

SO ORDERED.

3. The court's injunction concerning Stabilizer H has not been questioned and will stay in full force and effect.